## SURPLUS TRADING COMPANY *v.* COOK, SHERIFF.

No. 2. Argued November 21, 1928.—Decided June 2, 1930.

*Mr. Charles D. Cherry* argued the cause, and *Messrs. G. B.. Rose, D. H. Cantrell, J. F. Loughborough, A. W. Dobyns,* and *A. F. House* were on the brief, for plaintiff in error.

*Mr. Sam T. Poe,* with whom *Messrs. H. W. Applegate,* Attorney General of Arkansas, and *Tom Poe* were on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was a suit by the sheriff and collector of taxes of Pulaski County, Arkansas, to enforce payment by the Surplus Trading Company of taxes for the years 1922 and 1923, with penalties, upon certain personal property. The chancery court, in which the suit was brought, gave a decree for the defendant, and on appeal the Supreme Court of the State affirmed the decree as to the tax for 1923 and reversed it as to the tax for 1922 with a direction that a decree be entered for the plaintiff for the amount of that tax and the penalty, both of which were specified in the record, 174 Ark. 507.

The defendant resisted the collection of the tax for 1922 on the ground that the personal property on which it was laid was located within Camp Pike—an army mobilization, training and supply station of the United States lying within the exterior limits of Pulaski County—the lands in which had been purchased by the United States, with the consent of the legislature of the State, for the purpose of establishing, erecting and maintaining such an army station; and that the tax laws of the State could not be applied to property so located

without bringing them, in that regard, into conflict with Article I, § 8, cl. 17 of the Constitution of the United States, which prescribes that the Congress shall have power—

" To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular States, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings; . . ."

The property attempted to be taxed consisted of a large quantity of woolen blankets which the defendant, a New York concern, purchased from the United States at an advertised sale a few days before the day fixed by the state law for listing personal property for taxation, and which in much the greater part was on that day in the army storehouses within Camp Pike awaiting shipment therefrom.

The Supreme Court of the State, although recognizing that the status of Camp Pike was as just stated and that the property on which the tax was laid was in much the greater part located therein, rejected the contention that the tax laws of the State could not be applied to property so located consistently with the constitutional provision cited.

It is not unusual for the United States to own within a State lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal.

A typical illustration is found in the usual Indian reservation set apart within a State as a place where the United States may care for its Indian wards and lead them into habits and ways of civilized life. Such reservations are part of the State within which they lie and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards. Private property within such a reservation, if not belonging to such Indians, is subject to taxation under the laws of the State. Another illustration is found in two classes of military reservations within a State—one where the reservation, although established before the State is admitted into the Union, is not excepted from her jurisdiction at the time of her admission; and the other where the reservation, although established after the admission of the State, is established either upon lands set apart by the United States from its public domain or upon lands purchased by it for the purpose without the consent of the legislature of the State. In either case, unless there be a later and affirmative cession of jurisdiction by the State, the reservation is a part of her territory and within the field of operation of her laws, save that they can have no operation which would impair the effective use of the reservation for the purposes for which it is maintained. If there be private property within such a reservation which is not held or used as an incident of military service it may be subjected to taxation like other private property within the State.

As respects such a military reservation—that is, one which is neither excepted from the jurisdiction of the State at the time of her admission nor established upon lands purchased therefor with the consent of her legislature—the State undoubtedly may cede her jurisdiction to the United States and may make the cession either absolute or qualified as to her may appear desirable, provided the qualification is consistent with the purposes

for which the reservation is maintained and is accepted by the United States. And where such a cession is made and accepted it will be determinative of the jurisdiction of both the United States and the State within the reservation.

But Camp Pike is not in the same class with any of the reservations of which we have spoken and should not be confused with any of them. Nor should it be confused with military or other reservations within a Territory of the United States. It is not questioned, nor could it well be, that Camp Pike comes within the words " forts, magazines, arsenals, dock-yards, and other needful buildings " in the constitutional provision. The land therefor was purchased by the United States with the consent of the legislature of the State in 1917. The constitutional provision says that Congress shall have power to exercise " exclusive legislation in all cases whatsoever " over a place so purchased for such a purpose. " Exclusive legislation " is consistent only with exclusive jurisdiction. It can have no other meaning as to the seat of government, and what it means as to that it also means as to forts, magazines, arsenals, dock-yards, etc. That no divided jurisdiction respecting the seat of government is intended is not only shown by the terms employed but is a matter of public history. Why as to forts, magazines, arsenals, dock-yards, etc., is the power given made to depend on purchase with the consent of the legislature of the State if the jurisdiction of the United States is not to be exclusive and that of the State excluded?

The question is not an open one. It long has been settled that where lands for such a purpose are purchased by the United States with the consent of the state legislature the jurisdiction theretofore residing in the State passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction.

The first reported decision on the question is *Common-wealth* v. *Clary,* 8 Mass. 72. The question there was whether the law of Massachusetts restricting the sale of intoxicating liquors to persons procuring and paying for licenses could be applied to an arsenal of the United States in Springfield, the land for which had been purchased with the consent of the Commonwealth. The court held that the license law could not be so applied and in that connection said, p. 77:

"An objection occurred to the minds of some members of the court, that if the laws of the commonwealth have no force within this territory, the inhabitants thereof cannot exercise any civil or political privileges, under the laws of Massachusetts, within the town of Springfield. We are agreed that such consequence necessarily follows; and we think that no hardship is thereby imposed on those inhabitants;—because they are not interested in any elections made within the state, not held to pay any taxes imposed by its authority, nor bound by any of its laws. And it might be very inconvenient to the United States, to have their labourers, artificers, officers and other persons employed in their service, subjected to the services required by the commonwealth of the inhabitants of the several towns."

In *Mitchell* v. *Tibbetts,* 17 Pick. 298, the question was whether a law of Massachusetts relating to vessels bringing stone within that Commonwealth could be applied to a vessel landing stone at the Charlestown Navy Yard, the land for which had been purchased by the United States with the consent of the Commonwealth. The court ruled that the law could not be so applied because the Commonwealth no longer had any jurisdiction over the navy yard.

In *United States* v. *Cornell,* Fed. Case No. 14,867, Mr. Justice Story, at circuit, held that a state consenting to the purchase by the United States of land for a fort was

without jurisdiction of a public offense subsequently committed therein, and he stated his reasons as follows:

" The constitution of the United States declares that congress shall have power to exercise ' exclusive legislation ' in all ' cases whatsoever' over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings. When therefore a purchase of land for any of these purposes is made by the national government, and the state legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of congress, and the state jurisdiction is completely ousted. This is the necessary result, for exclusive jurisdiction is the attendant upon exclusive legislation; and the consent of the state legislature is by the very terms of the constitution, by which all the states are bound, and to which all are parties; a virtual surrender and cession of its sovereignty over the place. Nor is there anything novel in this construction. It is under the like terms in the same clause of the constitution that exclusive jurisdiction is now exercised by congress in the District of Columbia; for if exclusive jurisdiction and exclusive legislation do not import the same thing, the states could not cede or the United States accept for the purposes enumerated in this clause, any exclusive jurisdiction."

Of like import is the opinion of Mr. Justice Woodbury given at circuit in *United States* v. *Ames,* Fed. Cas. No. 14,441.

In *Sinks* v. *Reese,* 19 Ohio St. 306, which related to lands purchased with the consent of the legislature of Ohio for a national home for disabled volunteer soldiers, a question arose respecting the effect of a proviso in the act of consent declaring that nothing in the act should be construed to prevent residents of the home from exer-

cising the right of suffrage within the township in which the home was located. The Supreme Court of the State held that through the purchase of the site for the home with the consent of the state legislature the United States acquired exclusive jurisdiction over the site and that the residents of the home, being within that exclusive jurisdiction, were not residents of the State and therefore not entitled to vote therein.

In *Foley* v. *Shriver*, 81 Va. 568, it was held of lands within the State of Virginia purchased with her consent for another national home for disabled volunteer soldiers, that in virtue of the constitutional provision the purchase invested the United States with complete jurisdiction of the lands to the exclusion of the State, so that they were " no longer a part of the State of Virginia." And there was a like ruling in *Bank of Phoebus* v. *Byrum*, 110 Va. 708.

In *State* v. *Mack*, 23 Nev. 359, which related to a purchase by the United States with the state's consent of land for a post office and federal court building, it was held, notwithstanding a provision in the act of consent purporting to " except the administration of the criminal laws of the State," that the purchase operated under the constitutional provision to pass full jurisdiction over the land to the United States and to divest the State of all jurisdiction thereover, criminal as well as civil.

Like views of the operation of the constitutional provision are stated by Chancellor Kent in his Commentaries, Vol. 1, pp. *429–431; and by Judge Story in his work on the Constitution, 5th Ed., Vol. 2, §§ 1224–1227.

In *Fort Leavenworth R. R. Co.* v. *Lowe*, 114 U. S. 525, this Court said, p. 532:

" When the title is acquired by purchase by consent of the Legislatures of the States, the federal jurisdiction is exclusive of all State authority. This follows from the declaration of the Constitution that Congress shall have

' like authority ' over such places as it has over the district which is the seat of government; that is, the power of ' exclusive legislation in all cases whatsoever.' Broader or clearer language could not be used to exclude all other authority than that of Congress."

And after reviewing some of the earlier cases here cited the Court further said, p. 537:

" These authorities are sufficient to support the proposition which follows naturally from the language of the Constitution, that no other legislative power than that of Congress can be exercised over lands within a State purchased by the United States with her consent for one of the purposes designated; and that such consent under the Constitution operates to exclude all other legislative authority."

And the view thus expressed was given approving recognition in our recent decision in *United States* v. *Unzeuta, ante,* p. 138, where it is said that, where the United States purchases lands by the consent of the legislature of the State within which they are situated for the purposes named in the constitutional provision, " the federal jurisdiction is exclusive of all state authority."

Apparently some of the cases to which we have referred were not brought to the attention of the Supreme Court of Arkansas. In its opinion it appears to have been guided largely by cases dealing with reservations in Territories and with reservations in States of lands which were not purchased by the United States with the consent of the States. Such cases are not in point, for they do not turn on the constitutional provision which is of controlling influence in cases like this. Another matter to which that court attached some importance is that the act by which the legislature consented to the purchase of the site for Camp Pike declares that the State " releases and relinquishes her right to tax " the lands and improvements during the ownership of the United States. Ark.

Laws 1903, Act 180. These words of release it is argued disclose a purpose to reserve the power to tax, save as to the lands and improvements. But to this we do not assent. The words are ill-adapted to expressing such a purpose—so much so that, had it existed, there can be little doubt that it would have been stated differently. Not only so, but to construe the release as suggested would lead to a serious question respecting the validity of the release and would bring it into conflict with the preceding section, which directly states that the State " hereby consents to the purchase " of the site, and " the jurisdiction of this State within and over " the site " is hereby ceded " to the United States. The release is not in form or substance a proviso but is an affirmative provision inserted as an independent section and we think it means what it says and no more. That the legislature understood how to use a saving clause or proviso is evident from the following which appears at the end of the first section: " Provided, that this grant of jurisdiction shall not prevent execution of any process of this State, civil or criminal, upon any person who may be on said premises." Such a proviso is common to nearly all acts giving consent to purchase, and is regarded, says Chancellor Kent, as amounting, when accepted, to " an agreement of the new sovereign to permit the free exercise of such process, as being quoad hoc his own process." Kent's Commentaries, Vol. 1, p. *430.

For the reasons which have been stated we are of opinion that the Supreme Court of the State erred in holding that her tax laws could be applied to personal property within Camp Pike consistently with § 8, cl. 17, of Article I of the Constitution, and therefore that the judgment of that court must be reversed.

But to avoid any misapprehension it is well to state that our ruling is limited to the blankets which were within Camp Pike on May 1, 1922, the day fixed for

listing personal property for assessment. We are led to make this statement because the record suggests, if it does not show, that on that day 21,235 of the blankets purchased by the plaintiff were held by it in a private warehouse in Little Rock, the county seat of Pulaski County, and 64,371 was the number remaining in the government storehouses at Camp Pike. Whether the assessment which was on the whole can be proportionally sustained as to the part in Little Rock so that the plaintiff will be charged with only such portion of the tax as pertains to that part of the blankets is a question of state law on which we intimate no opinion.

The judgment will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*