## DANIELSON v. DONMOPRAY et al.
### No. 2183.

District Court, D. Wyoming.
April 2, 1932.

Albert D. Walton, H. S. Ridgely, and Ewing T. Kerr, all of Cheyenne, Wyo., for plaintiff.

William E. Hutton and B. B. McCay, both of Denver, Colo., and L. C. Sampson, of Cheyenne, Wyo., for defendants.

KENNEDY, District Judge.

This is a cause instituted in the state court seeking to recover damages growing out of the alleged negligence of the defendants in causing the death of plaintiff's intestate through an accident in which the defendant Roberts, at the special instance and request of the defendant Donmopray, was driving an automobile belonging to the latter, which accident occurred within the limits of the United States Military Reservation known as Ft. Francis E. Warren, in the state of Wyoming.

The case is before the court upon a motion to quash the summons and set aside the service thereof and also upon motion to dismiss the cause. As the motions are substantially addressed to the same point, they may, for the purposes of this memorandum, be considered together.

The facts upon which the motions are based are not in dispute. Within the time fixed by statute the defendants removed the case to this court upon the ground of diversity of citizenship, the appropriate amount in controversy being involved. The accident out of which the cause of action arose admittedly took place within the limits of the military reservation above mentioned. The summons was duly issued out of the state court and served upon the defendants within the limits of such reservation.

It is the contention of the defendants that, on account of the United States having exclusive jurisdiction over said reservation, neither the service of the summons at said reservation nor the cause of action growing out of an accident occurring within the limits of the reservation could be sustained in the state court, where the same was instituted.

It may be admitted that, if the state court had no jurisdiction over the controversy, this court has none by virtue of the removal. In Lambert Co. v. Balt. & Ohio R. R. Co., 258 U. S. 377, at page 382, 42 S. Ct. 349, 351, 66 L. Ed. 671, the court says: "The jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction." Venner v. Mich. Cent. R. R. Co., 271 U. S. 127–131, 46 S. Ct. 444, 70 L. Ed. 868.

The specific bases upon which the defendants press their claim are provisions of the Wyoming statute and the Federal Constitution. Wyoming Revised Statutes 1931, § 118-105, provides: "Exclusive jurisdiction shall be, and the same is, hereby ceded to the United States over and with all the territory owned by the United States, included within the limits of the United States military reservations known as Fort Francis E. Warren and Fort Washakie, Camp Sheridan and Camp Pilot Butte, and the United States powder depot at Cheyenne, together with such other lands in the state as may be now, or hereafter, acquired or held by the United States for military purposes, either as additions to the posts above named, or as new military posts or reservations, which may be established for the common defense; saving, however, to the said state the right to serve civil or criminal process within the limits of the aforesaid forts, camps and depot, in suits or prosecutions for, or on account of rights

acquired, obligations incurred or crimes committed in said state, but outside of said cession and reservation; and saving further to said state the right to tax persons and corporations, their franchises and property, on said lands hereby ceded."

The Constitution of the United States, article 1, § 8, clause 17 (relating to the powers of Congress), provides: "To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may be, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."

The point involved is suggested by that portion of the quoted statute embraced within the so-called saving clause by which the right is reserved to the state to serve criminal or civil process in suits or prosecutions on account of rights acquired, obligations incurred, or crimes committed in said state, but outside of said ceded portion, taken in connection with the provisions of the Federal Constitution of Congress exercising exclusive legislation and authority over the areas involved in the suit. The civil obligation having arisen inside of the ceded tract, it is claimed that the state court had no jurisdiction of the cause, and that no service could be made upon the defendants therein.

The statute above quoted became a law through the action of the Wyoming Legislature in 1893.

It is evident that the plaintiff's cause of action is based upon certain other provisions of the Wyoming statute. Its counterpart originated in the English Parliament, and was there known as Lord Campbell's Act. According to the opinion of the Supreme Court of Wyoming in Coliseum Motor Co. v. Hester, 3 P.(2d) 105, this statute was enacted into law by the territory of Wyoming in 1871. With the admission of the territory into the Union, the Wyoming Constitution, art. 10, § 4, provided that there should be no limit to the amount of damages to be recovered for causing the injury or death of any person, the territorial statutory provision having provided a limitation of $5,000. This limitation remained a part of the law after Wyoming became a state, despite the constitutional provision, until some time later when by legislative enactment it was removed, but the statute in other respects has remained substantially the same. This statute as now in force and effect is found in Wyoming Revised Statutes 1931, §§ 89-403 and 89-404, which read as follows:

"89-403. Whenever the death of a person shall be caused by wrongful act, neglect or default and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof; then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter."

"89-404. Every such action shall be brought by, and in the name of, the personal representative of such deceased person; and the amount received in every such action shall be distributed to the parties and in the proportions provided by law, in relation to the distribution of personal estates left by persons dying intestate. In every such case, the jury shall give such damages as they shall deem fair and just, and the amount so recovered shall not be subject to any debts or liabilities of the deceased; provided, that every such action shall be commenced within two years after the death of such deceased person."

It may be admitted that Congress has never enacted any specific legislation applying to Ft. Warren or any other military reservation covering alleged causes of action arising as in the case at bar. At least none has been suggested by counsel.

 I am of the opinion that the rule which must govern this case is that Congress having failed to adopt legislation within the scope of its exclusive legislation and jurisdictional power after the cession to it by the state of the area included within the reservation, the general laws covering civil liability in the area as then constituted must be regarded as the law applicable to the situation; and the statute here being invoked by plaintiff having been adopted in 1871 and in force before the cession in 1893 by the state to the government of the area embraced within the reservation, that it must be held as the law in force and effect as applied to the circumstances in the present case.

This conclusion is primarily based upon the case of *Chicago, Rock Island & Pacific*

Ry. Co. v. McGlinn, 114 U. S. 542, 5 S. Ct. 1005, 29 L. Ed. 270. In that case a suit was brought in the state court of Kansas under a state statute relating to the killing or wounding of stock by railroads in which the plaintiff sought damages for the value of an animal killed by such railroad within the limits of the Ft. Leavenworth Military Reservation existing under a cession of the state of Kansas almost identical in its terms with the Wyoming statute, in that it contained the saving clause as to the right to serve civil or criminal process in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said state, but outside of such cession and reservation. Substantially the same contention was made by the railway company in that case as is made by the defendants here. The Supreme Court, in disposing of the matter at pages 546, 547 of 114 U. S., 5 S. Ct. 1005, 1006, says:

"Upon the second question the contention of the railroad company is that the act of Kansas became inoperative within the reservation upon the cession to the United States of exclusive jurisdiction over it. We are clear that this contention cannot be maintained. It is a general rule of public law, recognized and acted upon by the United States, that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country —that is, laws which are intended for the protection of private rights—continue in force until abrogated or changed by the new government or sovereign. By the cession public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions, and constitution of the new government are at once displaced. Thus, upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion, or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use, and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general, that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed. American Insurance Co. v. Canter, 1 Pet. 542 [7 L. Ed. 242]; Halleck, Int. Law, c. 34, § 14.

"The counsel for the railroad company does not controvert this general rule in cases of cession of political jurisdiction by one nation to another, but contends that it has no application to a mere cession of jurisdiction over a small piece of territory having no organized government or municipality within its limits; and argues upon the assumption that there was no organized government within the limits of Fort Leavenworth. In this assumption he is mistaken. The government of the state of Kansas extended over the reservation, and its legislation was operative therein, except so far as the use of the land as an instrumentality of the general government may have excepted it from such legislation. In other respects, the law of the state prevailed. There was a railroad running through it when the state ceded jurisdiction to the United States. The law of the state, making the railroad liable for killing or wounding cattle by its cars and engines where it had no fence to keep such cattle off the road, was as necessary to the safety of cattle after the cession as before, and was no more abrogated by the mere fact of cession than regulations as to the crossing of highways by the railroad cars, and the ringing of bells as a warning to others of their approach.

"It is true there is a wide difference between a cession of political jurisdiction from one nation to another, and a cession to the United States by a state of legislative power over a particular tract, for a special purpose of the general government, but the principle which controls as to laws in existence at the time is the same in both. The liability of the railroad company for the killing of the cow did not depend upon the place where the animal was killed, but upon the neglect of the company to inclose the road with a fence which would have prevented the cow from straying upon it. The law of Kansas on the subject, in our opinion, remained in force after the cession, it being in no respect inconsistent with any law of the United States,

and never having been changed or abrogated."

Other cases in point are as follows: Crook, Horner & Co. v. Old Point Comfort Hotel Co. (C. C. E. D. Va.) 54 F. 604; In re Chavez (C. C. A. 8) 149 F. 73; Steele v. Halligan (D. C. W. D. Wash.) 229 F. 1011.

Certain cases are cited by counsel for defendants upon which they base their contention. Western Union Tel. Co. v. Chiles, 214 U. S. 274, 29 S. Ct. 613, 53 L. Ed. 994, concerns an attempt to enforce a penalty for failure to promptly deliver a telegraph message under a statute of the state of Virginia, where it was ascertained that the alleged violation of the statute occurred within the limits of a Federal Navy Yard. It was there held that it was the prerogative of Congress to prescribe penalties to be applied to the territory over which the United States has exclusive control. In Surplus Trading Co. v. Cook, 281 U. S. 647, 50 S. Ct. 455, 74 L. Ed. 1091, it was held that private personal property situated upon a government reservation could not be taxed by the state. These cases are distinguishable on facts and principle from the case at bar. In my opinion, the Rock Island Case rules this case. The jurisdiction of the state court over the controversy carries with it the reasonable inference that the service of the process may be made upon the reservation.

For the reasons stated, the motions to quash and dismiss will be overruled, and an order may be entered to that effect, allowing defendants twenty days from the date of this memorandum to file an answer and reserving to them proper exceptions.

The identical questions are raised in the case of Brown against the same defendants, No. 2184, Civil Law, and the causes having been briefed and submitted together, the same order will be entered in that case.