## Game Laws in National Forests

ADAMS, Deputy Attorney General, August 5, 1940.— We have your recent request that the opinion dated Sep-

tember 26, 1921, given by this department to the Honorable Gifford Pinchot, then Commissioner of Forestry, by William I. Swoope, Deputy Attorney General, In re Federal Lands, Off. Op. of Att. Gen. of Pa., 1921-1922, p. 247, be reviewed.

You also ask that the opinion, Game on National Forest Lands, 8 D. & C. 688 (1926), issued by former Deputy Attorney General M. A. Carringer to W. Gard Conklin, Chief, Division of Lands, of the Board of Game Commissioners, be reviewed.

The opinion first above mentioned holds that the game and fish laws of the State of Pennsylvania will be superseded on lands purchased by the Federal Government, under the Act of May 11, 1911, P. L. 271, as amended by the Act of April 21, 1921, P. L. 257, 32 PS §101, by the laws of the United States.

The second opinion mentioned in your letter holds that the jurisdiction of Pennsylvania as to game and fish is superseded by the laws of the United States and the regulations of the United States Department of Agriculture. This opinion refers specifically to the Allegheny National Forest and the Tobyhanna National Forest; and it also states that this opinion was supported by the opinion of Deputy Attorney General Swoope, given to Honorable Gifford Pinchot, Forest Commissioner, dated September 26, 1921.

In undertaking this review, we will confine ourselves to lands purchased by the Federal Government for National forests, disregarding land purchased for post offices and other buildings.

Under our form of government, the powers of the Federal Government are limited to those granted to it, either expressly or by implication, in the United States Constitution. All other powers are reserved to the State Government.

Turning, therefore, to the Constitution of the United States, we find that article I, sec. 8, cl. 17, reads as follows:

"The Congress shall have Power:

"To exercise exclusive Legislation in all Cases whatsoever . . . and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful buildings . . .".

National forests cannot be held to be included in the terms listed, or in the term "other needful buildings"; therefore, the United States cannot look to this clause in the Constitution as authority for exclusive jurisdiction over National forests.

No grant of exclusive legislation having been made to the Federal Government, the power is therefore reserved in the State, unless the State has ceded such power. That these cessions can be and have been made will be shown by the following authorities:

In the case of Collins et al. v. Yosemite Park & Curry Co., 304 U. S. 518, 82 L. ed. 1505, the court said at page 528:

*"The States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, coöperatively adjust problems flowing from our dual system of government. Jurisdiction obtained by consent or cession may be qualified by agreement or through offer and acceptance or ratification. It is a matter of arrangement. These arrangements the courts will recognize and respect."* (Italics supplied.)

In the case of James, etc., v. Dravo Contracting Co., 302 U. S. 134, 82 L. ed. 155, the Supreme Court held that clause 17, of article I, sec. 8, of the Constitution of the United States contained no express stipulation that the consent of the State must be without reservation.

In the case of Bowen v. Johnston, 306 U. S. 19, 83 L. ed. 455, the Supreme Court said (p. 23):

"Whether or not the National Government acquired exclusive jurisdiction over the lands within the Park or

the State reserved, as it could, jurisdiction over the crimes there committed, *depended upon the terms of the consent or cession* given by the legislature of Georgia." (Italics supplied.)

Let us now examine the statutes of Pennsylvania to ascertain the terms of the cession.

We find no statutes referring specifically to the Allegheny National Forest or the Tobyhanna National Forest, but we do find an act which refers to National forest reserves in general terms.

The Act of 1911, as amended by the Act of 1921, supra, is entitled:

"An act empowering the United States of America to acquire land in the State of Pennsylvania for National Forest Reserves, by purchase or by condemnation proceedings; and granting to the United States of America all rights necessary for control and regulation of such reserves."

Section 3 of the Act of 1911, supra, provides that the United States of America is empowered to pass such laws and to make or provide for the making of such rules, of both a civil and criminal nature, and provides a punishment for the violation thereof, as in its judgment may be necessary for the management, control, and protection of such lands acquired from time to time by the United States of America under the provisions of this act; *Provided, however, That the authority hereby given shall be subject to all conditions and stipulations and reservations contained in this act.*

Section 1 of the Act of 1911, supra, empowers the United States of America to acquire by purchase such lands in Pennsylvania as, in the opinion of the Federal Government, may be needed for the establishment of National forest reserves in Pennsylvania, in accordance with a Federal act, being the Act of March 1, 1911, 36 Stat. at L. 961, entitled:

"An Act To enable any State to coöperate with any other State or States, or with the United States, for the

protection of the watersheds of navigable streams, and to appoint a commission for the acquisition of lands for the purpose of conserving the navigability of navigable rivers"; and then follows with this reservation:

"And provided further, That the Commonwealth of Pennsylvania shall retain a concurrent jurisdiction with the United States in and over such lands, so far that civil process, in all cases, and such criminal process as may issue under the authority of the Commonwealth of Pennsylvania against any persons charged with the commission of any crime, *without or within said jurisdiction,* may be executed thereon in like manner as if this act had not been passed." (Italics supplied.)

It will be noted that the Act of 1911, as amended, 32 PS §101, refers to the act of Congress empowering the United States to acquire National forest reserves. This act, in section 12, reads as follows:

"That jurisdiction, both civil and criminal, over persons upon the lands acquired under this Act shall not be affected or changed by their permanent reservation and administration as National forest lands, except so far as the punishment of offenses against the United States is concerned, *the intent and meaning of this section being that the State wherein such land is situated shall not, by reason of such reservation and administration, lose its jurisdiction* nor the inhabitants thereof their rights and privileges as citizens or be absolved from their duties as citizens of the State." (Italics supplied.)

It thus appears that both the act of assembly of the Commonwealth of Pennsylvania and the act of Congress provided for concurrent jurisdiction.

In addition to preserving specifically the civil and criminal jurisdiction over those public forest reserves possessed by the several States, the Congress of the United States, two years after the passage of the Act of June 4, 1897, 30 Stat. at L. 34-36, which was an act for the administration of National forests, and which contained a provision identical to section 12 of the Act

of 1911, supra, 16 U.S.C. §480, imposed upon the executive branch of the Federal Government the affirmative duty of aiding in the enforcement upon these areas of the fish and game laws of the States in which such forest reservations are situated.

The Appropriation Act of March 3, 1899, 30 Stat. at L. 1074, contains at page 1095 the following provision:

"That forest agents, superintendents, supervisors, and all other persons employed in connection with the administration and protection of forest reservations shall in all ways that are practicable, aid in the enforcement of the laws of the State or Territory in which said forest reservation is situated, in relation to the protection of fish and game . . ."

The mandatory duty of aiding in the enforcement of game and fish laws of the States was thus imposed upon all persons employed in the administration and protection of Federal forest reservations.

This mandate of Congress was repeated in the Act of March 4, 1907, 34 Stat. at L. 1256, 1269, and in the Act of May 23, 1908, 35 Stat. at L. 251, 259, 16 U.S.C. 553.

On August 13, 1936, the Secretary of Agriculture, acting under the authority created by the Acts of 1897, supra, and February 1, 1905, 33 Stat. at L. 628, adopted certain "Regulations of the Secretary of Agriculture Relating to the Protection, Occupancy, Use, and Administration of the National Forests", which appear in 1 Fed. Reg. 1259, et seq.

Executive recognition that the game and fish laws of the State in which Weeks Act forests are located are in full force and effect upon the areas comprised within such forests is shown by the following regulation, 1 Fed. Reg. 1261:

"Reg. A-11. *All forest officers* will coöperate with State officials, in so far as practicable, to enforce *State fire, game, and health laws*. They are authorized to accept appointments, without compensation, as deputy State fire wardens, game wardens, and/or health officers whenever

in the judgment of the Chief of the Forest Service the performance of the duties required by these officers will not interfere with their duties as Federal forest officers." (Italics supplied.)

Reg. T-7, 3 Fed. Reg. 919, issued April 15, 1938, reads as follows: The following acts are prohibited on lands of the United States within National Forests: "Hunting, trapping, catching, disturbing, killing, or having in possession any kind of game animal, game or non-game bird or fish, or taking the eggs of any such bird, *in violation of the laws of the State* in which such land is situated." (Italics supplied.)

This view, in our opinion, is supported also by the following statute:

The Act of March 10, 1934, 48 Stat. at L. 400, 16 U.S.C. 694, provides for fish and game sanctuaries in National forests. This act authorizes the making of rules and regulations and makes it unlawful to hunt or fish upon lands of the United States within the limits of said fish and game sanctuaries. Sections 2 and 3 of the act read as follows:

"That when such fish and game sanctuaries or refuges have been established as provided in section 1 of this act, hunting, pursuing, poisoning, angling for, killing, or capturing by trapping, netting, or any other means or attempting to hunt, pursue, angle for, kill, or capture any wild animals or fish for any purpose whatever upon the lands of the United States within the limits of said fish and game sanctuaries or refuges shall be unlawful except as hereinafter provided, and any person violating any provision of this Act or any of the rules and regulations made under the provisions of this Act shall be deemed guilty of a misdemeanor and shall upon conviction in any United States court be fined in a sum of not exceeding $100 or imprisonment not exceeding six months, or both.

"Sec. 3. That the Secretaries of Agriculture and Commerce shall execute the provisions of this Act, and they

are hereby jointly authorized to make all needful rules and regulations for the administration of such fish and game sanctuaries or refuges in accordance with the purpose of this Act, including *regulations not in contravention of State laws for hunting, capturing, or killing predatory animals, such as wolves, coyotes, foxes, pumas,* and other species destructive to livestock or wild life or agriculture within the limits of said fish and game sanctuaries or refuges: *Provided, That the present jurisdiction of the States shall not be altered or changed without the legislative approval of such States.*" (Italics supplied.)

We find, therefore, repeated enactments by Congress, first as to forest reserves created by virtue of the Act of June 4, 1897, supra, and second as to forests created by virtue of the Weeks Act, supra, and regulations issued by the executive authorities pursuant thereto, that it was the intention of the Federal legislative and executive branches that the jurisdiction of the States should be preserved.

The question arises as to what is meant by "concurrent jurisdiction". A definition as given in 12 C. J. 395 is:

"That of several different tribunals, each authorized to deal with the same subject matter. The term is usually applied to two or more courts."

One of the other definitions given in footnote 32 is:

"Concurrent jurisdiction is that jurisdiction exercised by different courts at the same time over the same subject matter and within the same territory, and wherein litigants may, in the first instance, resort to either court indifferently".

In 16 C. J. 62, §18, it is said:

"The constitutional power of congress to enact legislation to define crimes and provide for their punishment implies the power to enact that such legislation shall be exclusive of the statutes of the states, and if it does so expressly or impliedly the states cannot punish such acts as offenses against the state. *Where this is not done,*

*either expressly or by necessary implication, the statute of the state is not superseded by the federal statute, and the same act may be punished as an offense against the United States and also as an offense against the state.*" (Italics supplied.)

In 16 C. J. 161, §185, it is said:

"The rule of comity between the federal and the state courts is the same in criminal as in civil cases; and, where each can take jurisdiction, the one which first gets it holds it to the exclusion of the other."

.    .    .    .    .    .    .    .    .    .

That the courts have upheld the reserved powers in statutes of cession will be noted from the following:

In the case of Fort Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, 29 L. ed. 264, the question was, whether a railroad running into the military reservation of Fort Leavenworth was subject to taxation by the State of Kansas. The United States had had exclusive jurisdiction over the land in question from 1803 by the cession of France until the admission of Kansas into the Union. For many years before such admission the land had been reserved from sale by the United States for military purposes, and occupied as a military post. Until the admission of Kansas the governmental jurisdiction of the United States was complete; but when Kansas came into the Union in 1861, on an equal footing with the original States, the previous military reservation was not excepted from the succeeding jurisdiction of the new State. The Attorney General recommended a State cession of jurisdiction, but it was not given until February 1875, when the Kansas Legislature enacted the following as quoted from the Fort Leavenworth case (p. 528):

" 'That exclusive jurisdiction be, and the same is hereby ceded to the United States over and within all the territory owned by the United States, and included within the limits of the United States military reservation known as the Fort Leavenworth Reservation in said State, as declared from time to time by the Presi-

dent of the United States, saving, however, to the said State the right to serve civil or criminal process within said Reservation, in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said State, but outside of said cession and Reservation; and *saving further to said State the right to tax railroad, bridge,* and other corporations, their franchises and property, *on said Reservation'.*" (Italics supplied.)

The Supreme Court of the United States upheld the reserved power of the State of Kansas to tax railroad property in the reservation. It may be noted, however, that the reserved power of serving criminal or civil process was reserved only as to rights acquired or crimes committed in said State, but outside of said cession and reservation.

In the case of State of Colorado v. Toll, etc., 268 U. S. 228, 69 L. ed. 927, the United States Supreme Court sustained the right of the State of Colorado to enjoin a Federal officer from doing acts which the State claimed he had no authority to do in a National park created within the State of Colorado, where there had been no act of cession from the State of Colorado.

In the case of Surplus Trading Co. v. Cook, etc., 281 U. S. 647, 74 L. ed. 1091, the Supreme Court said on page 650:

"It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the state. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with *its* rights of disposal."

In James, etc., v. Dravo Contracting Co., supra, answering the contention that the reservation of concurrent ju-

risdiction to the State was void, the court said, on pages 146-49:

"But it is urged that if the paragraph be construed as seeking to qualify the consent of the State, it must be treated as inoperative. That is, that the State cannot qualify its consent, which must be taken as carrying with it exclusive jurisdiction by virtue of Clause 17. . . .

"It is not questioned that the State may refuse its consent and retain jurisdiction consistent with the governmental purposes for which the property was acquired. The right of eminent domain inheres in the Federal Government by virtue of its sovereignty and thus it may, regardless of the wishes either of the owners or of the States, acquire the lands which it needs within their borders. *Kohl* v. *United States*, 91 U. S. 367, 371, 372. In that event, as in cases of acquisition by purchase without consent of the State, *jurisdiction is dependent upon cession by the State and the State may qualify its cession by reservations not inconsistent with the governmental uses.* Story on the Constitution, Vol. 2, §1227; *Kohl v. United States, supra,* p. 374; *Fort Leavenworth R. Co.* v. *Lowe, supra; Surplus Trading Co.* v. *Cook, supra; United States* v. *Unzeuta, supra.* The result to the Federal Government is the same whether consent is refused and cession is qualified by a reservation of concurrent jurisdiction, or consent to the acquisition is granted with a like qualification. As the Solicitor General has pointed out, a transfer of legislative jurisdiction carries with it not only benefits but obligations, and it may be highly desirable, in the interest both of the national government and of the State, that the latter should not be entirely ousted of its jurisdiction. *The possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired. There appears to be no reason why the United States should be compelled to accept exclusive jurisdiction or*

*the State be compelled to grant it in giving its consent to
purchases.*

"Normally, where governmental consent is essential,
the consent may be granted upon terms appropriate to
the subject and transgressing no constitutional limita-
tion. . . .

*"Clause 17 contains no express stipulation that the con-
sent of the State must be without reservations. We think
that such a stipulation should not be implied.* We are un-
able to reconcile such an implication with the freedom of
the *State and its admitted authority to refuse or qualify
cessions of jurisdiction when purchases have been made
without consent or property has been acquired by condem-
nation.* In the present case the reservation by West Vir-
ginia of concurrent jurisdiction did not operate to deprive
the United States of the enjoyment of the property for
the purposes for which it was acquired, and we are of the
opinion that the reservation was applicable and effec-
tive." (Italics supplied.)

Summing up, we conclude that National forests in
Pennsylvania purchased by the Federal Government, pur-
suant to the Act of May 11, 1911, P. L. 271, are not within
the enumeration of clause 17, of article I, sec. 8, of the
Constitution of the United States; that Pennsylvania had
the authority under the law to make reservations of pow-
ers when the cessions granted in the Act of 1911, as
amended by the Act of 1921, supra, were enacted; and
that these reservations have been recognized by the legis-
lative and executive branches of the Federal Governmnt.

We are, therefore, of the opinion, and you are accord-
ingly advised that the Commonwealth of Pennsylvania
has, to the extent indicated, retained concurrent jurisdic-
tion over lands sold to the Federal Government for Na-
tional forests, and the game laws of Pennsylvania may
be enforced thereon so long as such enforcement does not
deprive the United States of the enjoyment of the prop-
erty for the purposes for which it was acquired. We call
your attention again, however, to the fact that this opin-

ion applies only to National forests owned by the Federal Government in Pennsylvania, purchased by the Federal Government pursuant to the Act of May 11, 1911, P. L. 271, as amended.

The opinions reviewed are consequently modified to the extent indicated.