McGWINN ET, Plaintiffs-Appellants, v. BOARD OF EDUCA-
TION OF CLEVELAND CITY SCHOOL DISTRICT ET, De-
fendants-Appellees.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20170.   Decided July 16, 1946.

Schweid, Snyder, Torbet & Zucker, Cleveland, for plaintiffs appellants.

Lee C. Howley, Director of Law, Chas. W. White, Asst. Director of Law, Cleveland, for City of Cleveland.

Charles N. Malone, Paul F. Jansen, for Federal Public Housing Authority.

HILDEBRANT, P. J., MATTHEWS and ROSS, JJ., of the First District, sitting by designation in the Eighth District.

## OPINION

By HILDEBRANT, P. J.

The question in this case is whether a court of equity will enjoin the Board of Education of the Cleveland City School District from granting free admission to the public schools of all children residing in Federal Housing Projects located on lands owned by the United States and operated in conjunction with the State of Ohio, cooperating under its housing laws.

There being no controversy as to the facts attending the creation and general operation of the various projects a description and classification of the same is taken from defendants' brief, as follows:

"It appears therefrom that there are or were twelve (12) public housing estates in the Cleveland City School District, all of which are owned by the Federal Government.

A. FEDERAL PROJECTS: These are three (3) in number—Cedar Apartments, Outhwaite Homes and Lakeview Terrace. They were constructed by the United States on land acquired by it for the purpose under the National Industrial Recovery Act of 1933. They contain 1853 dwelling

units. They are slum-clearance projects for low-income families. Administration was lodged originally in the Federal Emergency Works Administration, then in the United States Housing Authority (USHA) and finally in the Federal Public Housing Authority (FPHA). Land and buildings have been owned by the United States from the beginning. Following the passage of the United States Housing Act in 1937 and the establishment of USHA, management and operation of the estates have devolved upon the Cleveland Metropolitan Housing Authority (CMHA) by agreement in writing between the proper federal agency and itself. B. AIDED PROJECTS: These are four (4) in number—Valleyview Homes, Outhwaite Extension No. 1, Woodhill Homes and Carver Park (sometimes referred to in the record as Outhwaite Extension No. 2). Land was acquired and estates constructed with federal assistance. These estates contain an aggregate of 2886 dwelling units. They are also slum-clearance projects for low-income families.

CMHA came into existence following a certification by the State Housing Authority that there was need for such an agency in Greater Cleveland. Federal Assistance involved a loan and contribution agreement between the federal and local authorities and annual subsidies by the former conditioned upon local contributions to the extent of twenty per centum, (20%) of the subsidy. The subsidy took the form of an annual grant in an amount representing the difference between what low-income families could pay as rent and what economic rents would produce if the estate were privately owned and operated. Local contributions could, and quite universally did, take the form of tax exemption whereby no monetary outlay by state or local authorities became necessary.

Upon the realization of local matching, housing authorities were empowered to enter into agreements with political subdivisions for the payment to the letter of service charges, so-called. Such agreements were entered into with the city, county and defendant board in 1938. Payments thereunder were made and continued until the end of 1942. The amount was arrived at 'by taking the value of the land prior to demolition of the slum buildings' and applying to it the tax rate current at the time of such demolition. At the time the said agreements were entered into the service charge approximated $16,000. That sum was distributed among the

city, county and city school district, proportionately, as tax monies are distributed. Following the decisions of the Ohio Supreme Court in 1942 that said aided estates were subject to taxation, payment of service charges were either refused by the local subdivisions or discontinued.

When the Supreme Court of Ohio held the aided projects to be subject to taxation by the state the same were then owned by CMHA. The decisions occasioned a default in the loan and contribution agreement between federal and local housing authorities. As a result the aided projects became the properties of the United States as of April 1, 1943. Obligation for taxes from 1939 through 1942 is acknowledged. Accordingly, there has been paid to the Auditor of Cuyahoga County as and on account of such obligation during 1945, $186,163.62. Defendant board is entitled to its distributive share thereof in the same proportion as other taxes. Of the aggregate sum of $104,207.64 paid in February, 1945, the defendant board received $31,950.00 as its distributive share. Said projects, being owned by the United States since April 1, 1943, are not taxable from that time.

In Cleveland, slum-clearance housing projects have been located with reference to nearby and existing school facilities. Within the confines of Outhwaite Homes there are two public school buildings. They are located on land owned by defendant board. Two rooms in the Carver Park Community Building are being used by defendant Board as school rooms for younger children who live both within and without the Project.

C. WAR HOUSING PROJECTS. These are five (5) in number and embrace (a) projects of a permanent construction—Riverside Park and that part of Brooklyn Acres which lies within the City of Cleveland—and (b) projects of temporary construction—Seville Homes, Kinsman and Woodland Dwellings and Victory Park. They are so-called 'Lanham Act' projects.

Riverside Park and Brooklyn Acres are constructed on land acquired and owned by the United States. They contain 780 dwelling units.

Seville Homes, Kinsman and Woodland Dwellings and

Victory Park are situated on lands privately owned and leased by the United States from the owners. The owners pay taxes on the land. Seville Homes has about 440 dwelling units. Kinsman and Woodland Dwellings consist of prefabricated houses located on scattered vacant lots and comprise 445 units. Victory Park was a trailer camp, since abandoned as no longer needed, after construction of a nearby war housing project in another district, outside the Cleveland City School District.

All war housing projects are owned by the United States. They are operated by the local housing authority under a written agreement with FPHA.

The Lanham Act provides for payments in lieu of taxes to local subdivisions which approximate in amount what the taxes would be if the projects were privately owned. The amount to be paid is arrived at by applying the current tax rate to the valuation of the projects for tax purposes. The aggregate payment is divided among the local subdivisions in the same proportions as taxes are distributed. The local housing authority has nothing to do with such payments."

The principal claim of plaintiffs, who sue as taxpayers, are: A. By acquiring the land upon which the projects are located, the United States ipso facto acquired exclusive jurisdiction thereover, with a resulting ouster of State jurisdiction and loss of territorial control under State law, to extend local services including public schools to residents therein; B. By extending free schooling to children resident therein, an unlawful shifting of the tax burden takes place, so that the Ohio Constitutional provisions as to uniform taxation, and equal protection are violated, as well as the constitutional provisions relating to the creation of the public school system and the laws passed pursuant thereto.

Plaintiff's contention A has been judicially determined by the Supreme Court of the United States in decisions binding upon this court. B. At this point, it will be noted that consent of the State of acquisition of lands within its borders required for government purposes by the United States and cession of exclusive jurisdiction over such land to the United States has been provided by §§13770 and 13771 GC.

Pertinent Acts of Congress affecting plaintiff's contention A with relation to each group of projects here involved are in existence.

As affecting "A. Federal Projects" Title 40 U. S. C. A. Section 421, provides in part:

"The acquisition by the United States of any real property in connection with any low-cost housing, or slum-clearance project constructed with funds allotted to the Federal Emergency Administration of. Public Works pursuant to any law, shall not be held to deprive any State or political subdivision thereof of its civil and criminal jurisdiction in and over such property or to impair the civil rights under the local law of the tenants or inhabitants on such property; and insofar as any jurisdiction has been taken away from any such State or subdivision, or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such State or subdivision."

The intent of Congress is thus made clear to accept only such jurisdiction as is necessary and incident to the purposes for which the lands in Group A were acquired, and not only to refuse to accept exclusive jurisdiction thereover, but to return to the state any jurisdiction it might be deemed to have ipso facto acquired, not necessary nor incident to the purposes of the acquisition.

As affecting "B. Aided Projects" Title 42 U. S. C. A. Section 1401 et seq., provides in part:

"(b). The acquisition by the Authority of any real property pursuant to this chapter shall not deprive any State or political subdivision thereof of its civil and criminal jurisdiction in and over such property, or impair the civil rights under the State or local law of the inhabitants on such property; and insofar as any such jurisdiction may have been taken away or any such rights impaired by reason of the acquisition of any property transferred to the Authority pursuant to Section 1404 (d) of this title, such jurisdiction and such rights are hereby fully restored."

Again, the intent of Congress to renounce exclusive jurisdiction leaving State jurisdiction unimpaired is specifically expressed.

As affecting "C. War Housing Projects" the so-called Lanham Act, 142 U. S. C. A. Section 1547, provides:

"Notwithstanding any other provision of law, the acqui-

sition by the administrator of any real property pursuant to subchapters II-IV shall not deprive any State or political subdivision thereof, including any Territory or possession of the United States, of its civil and criminal jurisdiction in and over such property, or impair the civil rights under the state or local law of the inhabitants on such property."

No recession is expressed in the Lanham Act for the obvious reasons that its language expressly avoids depriving the States of their civil and criminal jurisdiction and the inhabitants thereof of their civil rights under state and local law.

Also of general application is Title 40 U. S. C. A. Section 255, which provides in part:

"Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases, and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be prescribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

This section has been judicially construed in Adams v. U. S. et al., 319 U. S. 312.

In the case at bar, no notice required by the above act has been given.

Ohio in its State Housing Law has provided in §1078-53 G C:

"For the purpose of aiding and cooperating in the planning, undertaking, construction or operation of ▮ housing projects located within the area in which it is authorized to act, any state public body may upon such terms, with or without consideration, as it may determine.

(a) Dedicate, sell, convey or lease any of its property to a housing authority or the federal government;

(b) Cause parks, playgrounds, recreational, community, educational, water, sewer or drainage facilities or any other works which it is otherwise empowered to undertake, to be furnished adjacent to or in connection with housing projects; .

* * * * * * * *

(d) Plan or replan, zone of rezone any part of such state public body; make exceptions from building regulations and ordinances;

(e) Enter ' into agreements (which may extend over any period, notwithstanding any provision or rule of law to the contrary) with a housing authority or the federal government respecting action to be taken by such state public body pursuant to any of the powers herein granted;

(f) Do any and all things, necessary or convenient to aid and cooperate in the planning, undertaking, construction or operation of such housing projects; and

* * * * * * * *"

### Sec. 1078-54 GC provides:

"In connection with any housing project located wholly or partly within the area in which it is authorized to act, any state public body may contract with a housing authority or the federal government with respect to the sum or sums (if any) which the housing authority or the federal government may agree to pay, during any year or period of years, to the state public body for improvements, services and facilities to be furnished by ' it for the benefit of such housing, project, but in no event shall the amount of such payments exceed the estimated cost to the state public body of the improvements, services or facilities to be so -furnished; provided, however, that the absence of a contract for such payments shall

in no way relieve any state public body from the duty to furnish, for the benefit of said housing project all such services and facilities as such state public body usually furnishes without a service fee."

The relationship of the dual sovereignties to land acquired by the United States has been held to be a Federal question.

Mason v. Tax Commission, 302 U. S. 186, 197;
Brewer-Elliott Oil Co. v United States, 260 U. S. 77, 87.
United States v Utah, 283 U. S. 64, 75.
Borax Consolidated v Los Angeles, 296 U. S. 10, 22.
Other holdings in Mason v Tax Commission, supra, are found in the fifth, sixth and ninth paragraphs of the syllabus, as follows:

"5. The term 'other needful buildings' in Const. Art. 1, Sec. 8, Cl. 17, embraces whatever structures are found to be necessary in the performance of the functions of the Federal Government. James v Dravo Construction Co., ante p. 134.

6. This clause of the Constitution does not imply that the consent of the State to purchase must be without any reservation of jurisdiction. James v Dravo Con. Co. ante p 134 Id.

Such an implication would not be consistent with the freedom of the state and with its admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation.

9. In acquiring land for federal purposes the Government is not compelled to accept a transfer of exclusive jurisdiction from the State."

At page 107 it is stated:

"The question of exclusive territorial jurisdiction is distinct. That question assumes the absence of any interference with the exercise of the functions of the Federal Government and is whether the United States has acquired exclusive legislative authority so as to debar the State from exercising any legislative authority, including

its taxing and police power, in relation to the property and activities of individuals and corporations within the territory. The acquisition of title by the United States is not sufficient to effect that exclusion. It must appear that the State, by consent or cession, has transferred to the United States that residuum of jurisdiction which otherwise it would be free to exercise. Surplus Trading Co. v Cook, 281 U. S. 647, 650-652; James v. Dravo Con. Co. supra. See also, Fort Leavenworth R. Co. v Lowe, 114 U. S. 527-539; Arlington Hotel Co. v. Pant, 278 U. S. 439, 451; United States v M. Unzouta, 281 U. S. 138, 142."

At pages 203-204 the following appears:

"Lands acquired by purchase or condemnation. Appellants contend that exclusive jurisdiction as to these lands vested ipso facto in the Federal Government by the operation of Clause 17, Sec. 8, Art. I of the Federal Constitution, which provides that the Congress shall have power 'to exercise exclusive legislation' over 'all places purchased by the consent of the legislature of the State in which the same shall be for the erection of forts, magazines, arsenals, dock-yards and other needful buildings.' Considering this provision in James v. Dravo Contracting Co., supra, we construed the phrase 'other needful buildings' to embrace locks and dams and whatever structures are found to be necessary in the performance of the functions of the Federal Government. We also concluded that Clause 17 should not be construed as implying a stipulation that the consent of the State to purchases must be without reservations. We were unable to reconcile such an implication with the freedom of the State and its admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation."

In this connection, in **Renner v Bennett, 21 Oh St 431** Welch, C. J. states at **pages 448-449:**

"It gives 'power' to Congress to 'exercise exclusive legislation' over all such places 'purchased' by Congress 'by the consent of the legislature of the State.' The effect would have been the same had the provision been: 'Congress is authorized to purchase and hold the title' to such place and

to acquire from the State and exercise jurisdiction there-over; 'and the consent of the State to the purchase shall be deemed and held a sufficient grant of such jurisdiction.' The constitution divested the State of no jurisdiction and, thereover, vested none in congress. The transfer of jurisdiction to congress requires the joint action of congress and the state, and is a matter which belongs exclusively to them. The constitution had no agency in the transfer. It found the jurisdiction in the state and left it there. It merely gives to Congress the power to acquire and use the thing granted and prescribes a form or manner in which the grant may be made. No matter what may be the form of the grant, whether by consent to the purchase, or, as in this case, by direct cession, it is, nevertheless, in fact and in law, a grant by the State.

If this be so, it must follow that congress may relinquish the jurisdiction at its pleasure, as it may acquire it at pleasure. The 'power' to acquire and 'exercise' the jurisdiction, implies the power to omit its acquisition, and, as I think, also implies the power to acquire it, in part as well as in whole. The direct and simple object of the provision was, to enable congress to do that which, without such an enabling provision, it could not do, namely, to acquire and hold title to such property, and to acquire and exercise jurisdiction thereover, in such cases, to such extent, and during such times, as Congress might deem expedient. The constitution gave the necessary power, but left the full discretion as to its exercise to congress."

In the case of Mason v. Tax Commission, supra, at pages 207-208, in construing a statute of the state of Washington, similar to the Ohio statute, §13771, GC, it is stated:

"Not only do we find no violence done to federal right or frustration of federal intent by the State's construction of its statute, but the evidence is clear that, the Federal Government contemplated the continued existence of state jurisdiction consistent with federal functions and invited the cooperation of the state in providing an appropriate exercise of local authority over the territory.

Even if it were assumed that the state statute should be construed to apply to the federal acquisitions here involved, we should still be met by the contention of the

Government that it was not compelled to accept, and has not accepted, a transfer of exclusive jurisdiction. As such a transfer rests upon a grant by the State, through consent or cession, it follows, in accordance with familiar principles applicable to grants, that the grant may be accepted or declined. Acceptance may be presumed in the absence of evidence of a contrary intent, but we know of no constitutional principle which compels acceptance by the United States of an exclusive jurisdiction contrary to its own conception of its interests. The mere fact that the Government needs title to property within the boundaries of a State, which may be acquired irrespective of the consent of the State (Kohl v. United States, 91 U. S. 367-371, 372) does not necessitate the assumption by the Government of the burdens incident to an exclusive jurisdiction.

We have frequently said that our system of government is a practical adjustment by which the national authority may be maintained in its full scope without unnecessary loss of local efficiency. In acquiring property, the federal function in view may be performed without disturbing the local administration in matters which may still appropriately pertain to state authority. In our opinion in James v. Dravo Contracting Co. supra, we observed the possible importance of reserving to the State judisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired. And we added that there appeared to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases."

Application of the above principles to the instant case, in the light of the intent of Congress, as disclosed by the above quoted portions of the applicable enactments would alone seem sufficient to resolve the issue here of plaintiff's contention A in favor of the defendants. And certainly so in the light of the cooperation with the Federal Government, the State of Ohio expresses its State Housing Law above set forth.

From a reading of the statutes above quoted in conjunction with the paramount principles set forth in ju-

dicial decisions, supra, we conclude that plaintiffs' contention A must fail.

As to contention B, we observe the fatal defect to be that admission to the free public schools of this state in no way is dependent upon the payment of taxes. Whatever iniquity is present in the situation here revealed, must be charged to the failure of Federal Administration to function according to the plain intent of the congress and cannot be charged to the defendants, whose duties plainly appear upon a mere reading of the school laws of the State.

The remedy for correcting the distortion of the symmetry of the dual form of government occasioned by faulty administration, with or without ulterior motive, lies with the legislative branch rather than the judicial branch of government.

In addition to the observations above set forth we agree with the reasoning and authority contained in the opinion of the court below, and the same decree may be presented here.

HILDEBRANT, P. J., MATTHEWS, J., ROSS, J., concur in opinion and judgment.