## WELLMAN v. UNITED STATES.

(Circuit Court of Appeals, Sixth, Circuit. April 11, 1924.)

No. 3951.

1. Forgery ⊂⇒5—Employer who originated plan, and knew employé was issuing counterfeit bills of lading, could be convicted without further proof of knowledge.

An employer who originated the plan of issuing counterfeit bills of lading, and who knew that his employé was substituting forged bills of lading for originals from time to time as it became necessary to meet financial requirements, may be convicted of forging and uttering the forged bills without proof that he had actual knowledge of every forged bill issued by the employé.

2. Forgery ⊂⇒21—Employer who originated scheme of forging bills of lading was liable though accomplice delegated copying of bills to other employé.

Employer who originated plan of issuing forged bills of lading, and who knew that employé was issuing counterfeit bills from time to time when necessary to meet financial requirements, may be convicted of forging and uttering counterfeit bills of lading, whether the employé in question actually performed the physical act of copying the bills of lading himself or directed some other employé to do it for him.

3. Witnesses ⊂⇒317(1)—Jury may disregard testimony where it believes witness has willfully testified falsely as to other facts.

A jury which believes that a witness has knowingly and willfully testified falsely as to certain facts may disregard his testimony as to other facts.

4. Forgery ⊂⇒47—Whether employer originated scheme of issuing bills of lading forged by employé held for jury.

In prosecution of president and general manager and principal stockholder of corporation for forging and counterfeiting bills of lading issued by employé and uttering forged and counterfeit bills of lading, question whether the defendant originated the scheme, held for the jury.

5. Criminal law ⊂⇒1159(2)—Circuit Court of Appeals will not weigh evidence.

The Circuit Court of Appeals, in an error proceeding from District Court, will not weigh the evidence.

6. Criminal law ⊂⇒370, 371(5)—Evidence of prior transactions held admissible to prove criminal knowledge and intent in prosecution for forgery.

In prosecution for forging bills of lading and uttering forged bills, evidence as to prior transactions held admissible to prove criminal knowledge and intent.

7. Witnesses ⊂⇒277(2)—Cross-examination as to defendant's knowledge of other person's use of fraudulent bills of lading held admissible.

In a prosecution for forging bills of lading and uttering forged bills, in which government witness testified that defendant told him the plan had been used in another city, cross-examination of defendant as to his acquaintance with a certain man in such other city, and whether defend-

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ant knew that such other person had been using fraudulent bills of lading, *held* proper.

8. **Forgery ⊚⟶37—Testimony as to employé's income from sources other than salary held immaterial.**

In prosecution for forging bills of lading, in which it was shown that the fraudulent bills were issued by defendant's employé, testimony as to the employé's income from sources other than his salary *held* immaterial and irrelevant.

9. **Criminal law ⊚⟶759(1)—Instruction to infer promise of immunity or pardon from nonprosecution held properly refused.**

Refusal of instruction that a promise of immunity or pardon was to be inferred from nonprosecution of accomplice who testified for the government *held* proper, since the jury need not infer such a promise, though they might do so.

10. **Criminal law ⊚⟶1170(4)—Refusal to permit cross-examination held not error in view of other testimony disclosing feeling of witness.**

The refusal to permit cross-examination as to attitude of witness and his bank concerning immunity to an accomplice, *held* not error, in view of testimony that witness knew the accomplice had actually committed the forgery charged, that the prosecution was commenced against defendant at instance of bank, and that witness personally had a very bitter feeling against defendant.

11. **Witnesses ⊚⟶37(5)—Exclusion of testimony of character witness held proper in absence of foundation.**

Exclusion of testimony as to defendant's reputation for honesty, truth, and veracity *held* proper in absence of a showing that the witness was qualified as a character witness.

12. **Criminal law ⊚⟶1170(2)—Exclusion of testimony held not reversible error in view of other testimony as to same facts.**

Exclusion of testimony as to defendant's character *held* not reversible error in view of the testimony of six separate witnesses relative thereto.

13. **Criminal law ⊚⟶761(10)—Assumption in charge of elements of crime not in dispute held not error.**

The court did not err in assuming that bills of lading were forged and uttered and a bank defrauded where such elements of the crime were not in dispute, and were established by uncontradicted evidence.

14. **Forgery ⊚⟶48—Charge held not susceptible of construction that employer could not relieve himself from responsibility by directing employé to stop practice.**

In a prosecution for forging bills of lading issued by defendant's employé, charge *held* not susceptible of construction that defendant could not relieve himself from further criminal responsibility by directing employé to stop such practice.

15. **Criminal law ⊚⟶1186(4)—Failure to charge as to purpose for which evidence of good reputation might be considered held not ground for reversal.**

Where the court charged generally as to consideration of testimony of character witnesses, the failure to charge particularly as to the purpose for which it might be considered *held* not ground for reversal, under Jud. Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246).

16. **Criminal law ⊚⟶829(10)—Instruction as to testimony of confessed accomplice held sufficient rendering requested instruction unnecessary.**

Instruction as to consideration of testimony of confessed accomplice *held* sufficient, and refusal of requested instruction not erroneous.

17. **Forgery ⊚⟶21—Employer who aided in issuing forged bills of lading held guilty.**

An employer who aided in substituting forged bills of lading for the originals, was guilty of violating Act Aug. 29, 1916. § 41 (Comp. St. § 8604u), making it an offense to forge or aid in forging a bill of lading or to utter or aid in uttering a forged or counterfeit bill of lading without

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

recourse to the general statute (Penal Code, § 332 [Comp. St. § 10506]) as to aiding and abetting the commission of a crime.

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Ernest L. Wellman was convicted of forging and counterfeiting bills of lading and of uttering forged and counterfeit bills of lading, and he brings error. Affirmed.

Charles E. Ward, of Grand Rapids, Mich., for plaintiff in error.

Edward J. Bowman, U. S. Atty., and Howard A. Ellis, Asst. U. S. Atty., both of Grand Rapids, Mich.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. The plaintiff in error was tried and convicted upon an indictment containing 20 counts. Ten of these counts charged him with making, forging, counterfeiting, and printing certain bills of lading described therein. The other 10 counts charged him with uttering the same forged and counterfeit bills of lading. These offenses were charged to have been committed between the 19th day of December, 1921, and the 18th day of December, 1922.

At the time these offenses were charged to have been committed and for some time prior thereto the plaintiff in error was president and general manager of the E. L. Wellman Company, which company was engaged in the business of buying and selling farm products, grain, beans, and feed. Prior to the organization of this company, January 1, 1919, the plaintiff in error was conducting a like business as an individual dealer in these commodities. While conducting this business in his individual capacity Arthur K. Drueke was employed by him as a bookkeeper at a salary ranging from $12 to $25 per week. After the organization of the company Drueke became its treasurer, and continued in its employ as bookkeeper and cashier, for which services he was receiving in the year 1921 and in January, 1922, a salary of $38.50 per week. This corporation had a capital stock of $50,000, divided into 5,000 shares of the par value of $10 each, of which the plaintiff in error was the owner of 4,996 shares. Drueke became the owner of one share of the par value of $10. The remaining three shares were separately owned by three other individuals.

Some time in July or August of 1920 the financial condition of this company was such that it was unable to pay the drafts and take up the bills of lading of the grain shipped to its order, and when these drafts were presented for payment to Drueke, cashier, he would detach the original bill of lading from the draft, make a copy of the same, and pin it to the draft, returning both the draft and counterfeit bill of lading to the bank. The original bill of lading would then be attached to a draft upon the company's customers and deposited in the bank to the credit of the E. L. Wellman Company. Later, when the money was available, the draft with the forged bill of lading attached thereto would be paid. This was done from time to time as financial necessity required until the latter part of January, 1922, at which time there were such a large number of drafts with forged bills of ladings attached that the bank became suspicious, and upon investigation dis-

covered the facts as above stated. Some time thereafter the plaintiff was indicted for forging and uttering 10 separate bills of lading between the 19th day of December, 1921, and the 18th day of January, 1922, inclusive.

[1] There are a number of assignments of error, but they are largely comprehended in the claim that plaintiff in error was not properly convicted upon this record. In support of this it is insisted that even if Wellman, in July or August of 1920, did originate the plan or scheme of issuing these counterfeit bills of lading, subsequently carried out by Drueke, there is not sufficient proof in this case that he had anything whatever to do with any particular bill of lading set up in the indictment, and that the proofs were altogether too general and indefinite to charge the respondent in a criminal case with the forging or uttering of any one of them. In reply to this it is sufficient to say that, if Wellman originated the plan and knew that Drueke was substituting forged bills of lading for the originals from time to time as it became necessary to meet the financial requirements of the company, then it would be wholly unnecessary for the government to prove that Wellman had actual knowledge of each and every forged bill of lading that was issued by Drueke for this purpose.

[2] It is further claimed that Drueke did not forge and issue all of these counterfeit bills of lading, but, on the contrary, delegated to other employés of the company his supposed authority to make such forged bills of lading, and that a Mr. Hammerslag actually forged and counterfeited one of the bills of lading for the forging and uttering of which the plaintiff in error was convicted. The mere copying of one of these bills of lading was not in and of itself a forgery. Such a copy might have served a legitimate purpose. It is wholly unimportant whether Drueke actually performed the physical act of copying these bills of lading himself or directed some other employé to do this for him. The fact that Drueke either made, or caused to be made, the forged or counterfeit bill of lading, and then used it in furtherance of a scheme and plan originated by Wellman, if he did originate the same, cannot relieve either Wellman or Drueke from criminal responsibility.

[3-5] It is further claimed that Wellman testified that on the 22d of December, 1921, he told Drueke that this practice must stop; that his testimony in that behalf is uncontradicted by Drueke or any other witness, and that it is positively shown by the evidence that all of the forged bills of lading charged in the indictment were made and issued after that date, with the exception of two, and that it is more probable that both of these were also made and issued after that date. If, however, either one or both of these forged bills of lading were made and uttered prior to this date, then, even upon the theory of plaintiff in error, this conviction must stand. A careful examination of this record, however, does not disclose that he ever gave to Drueke any such orders. On the contrary, Wellman testified positively that he had no knowledge whatever that counterfeit bills of lading were substituted for the original and returned with the draft to the bank; that all the knowledge he had upon that subject was that on December 22, 1921, Drueke told him he had been taking the original bills of lading from the drafts and returning the drafts. It was this that Wellman testified he told Drueke must

stop. If, however, it were conceded that, notwithstanding Wellman's denial of knowledge of these forgeries, this instruction to Drueke would necessarily include the substitution of false and forged bills of lading, as well as the removal of the original bills, nevertheless, the jury was not required to believe Wellman's story in that behalf, regardless of whether it was denied by Drueke or any other witness. The truth of each and every uncorroborated statement made by Wellman must be determined by the jury in connection with all his testimony. If the jury believed that he was knowingly and willfully testifying falsely in other material respects, it had a right to disbelieve him in this particular. Wellman was the owner of this business. To all intents and purposes he was the E. L. Wellman Company. The other stockholders each held but one $10 share. Not only that, but he was the president and general manager of this company, and the question of providing the money for the conduct of the company's business from sources other than its legitimate revenue was not the duty of the book-keeper and cashier or any other paid employé. Notwithstanding these outstanding facts, Wellman testified that he did not originate the plan; that he did not direct or authorize Drueke to make and substitute these forged bills of lading or remove the original from the draft; and that he had no knowledge that anything of a questionable character was being done by Drueke until December 22, 1921, when Drueke told him merely that he was removing the original bills of lading from the drafts. This may be the truth, but, if so, unfortunately for Wellman it is not such a statement as would be readily believed by a jury of practical men. It is said, however, that the fact that Wellman owned substantially all the stock of this company, and that he was its president and general manager, is not proof that he was guilty of the offense charged, and that the verdict of guilty is predicated largely, if not entirely, upon this evidence. While the former proposition is true in the abstract, nevertheless human affairs must be judged by human standards. His interest in and absolute control of this company were facts to be taken into consideration by a jury in determining whether he did or did not have knowledge of the forging and uttering of these counterfeit bills of lading, especially in view of the direct conflict of the evidence in relation thereto. As opposed to Wellman's testimony Drueke testified that after Wellman had outlined this plan and scheme to him he proceeded to put it into operation; that he kept a memorandum of each transaction on a loose sheet of paper; that this sheet of paper was afterwards used as a reference by Wellman and himself; that both consulted it every day, and that Wellman, after examining this memorandum, would say to Drueke "that they would have to be cut down." The jury evidently believed the testimony of Drueke. This court has no power or authority to determine the question of the weight of the evidence.

The evidence of Drueke finds substantial corroboration in the evidence of Eugene Richards, assistant cashier of the Old National Bank of Grand Rapids. Among other things Richards testified that when he confronted Wellman with these forged bills of lading Wellman said to him, "We have been taking the genuine bills of lading from your drafts

and attaching them to our out-going shipments for a period of about two years"; that in a later conversation upon the same subject, he said, "Well, Paul, I am to blame for it." Upon another occasion, in the latter part of January, in Mr. Richards' home, Wellman said that they "had been removing good bills of lading but, if he were given an opportunity by the bank to work the thing out, that he could reimburse the bank every dollar that he had taken."

[6] It is also claimed that these prior transactions were improperly admitted in evidence. Testimony was offered on behalf of the government tending to prove that these transactions were forgeries; that the plan of forging and uttering these counterfeit bills of lading originated with Wellman; that he had access to and did examine from day to day the record that was kept by Drueke on a separate sheet of paper of each forged and substituted bill of lading. Upon this state of the proof the testimony relating to these prior transactions was properly admitted as tending to prove criminal knowledge and intent.

[7] It is further claimed that the court erred in permitting counsel for the government to inquire of Wellman on cross-examination in reference to his acquaintance with a man named Barrett who had formerly conducted a grain and bean business in Detroit, and if Wellman knew that Barrett had been in the habit of using fraudulent bills of lading. Drueke testified that Wellman told him this plan had been used in Detroit. It was therefore perfectly proper for the prosecution to show upon cross-examination of Wellman, as tending, to some extent, at least, to corroborate Drueke's testimony, that Wellman had actual knowledge that this plan had been in operation in a grain and bean business in Detroit, and it would also have been equally proper for the defense to have shown by Wellman's testimony, if it were true, that Wellman had no knowledge whatever of any such plan or procedure either in Detroit or elsewhere, as tending to prove that he had made no such statement to Drueke.

[8] It is also assigned as error that the trial court refused to permit defendant to testify as to Drueke's financial interest in this company, and that he received incomes from sources other than his salary. Drueke was cross-examined in reference to these matters, and counsel stated that it was not his intention to contradict Drueke's statements made upon cross-examination in these respects, but that he wanted to show by Wellman the history of the Grant Elevator transaction. That was immaterial and irrelevant.

While Drueke might also have been asked upon cross-examination as to opportunities for profit afforded him by his connection with this company other than the actual profits made by him while he was in its employ, counsel for defendant could not raise by direct proof this immaterial issue which reflected only upon the credibility of Drueke. Even if such direct proof were admissible, it is conceded that Drueke actually derived no other financial gain by or through this company except as stated by him upon his cross-examination.

There is much complaint involving the subject of immunity to Drueke as affecting his credibility as a witness. Obviously, the important thing was the extent of his hope or belief that by his testimony he could earn

favor. The absence of an actual promise of immunity was not of controlling importance; his belief and hope might have as good a foundation in implication, action, or nonaction as in promise. The failure for many months to indict him for forgery tended to create or confirm the belief by him that he would not be prosecuted if his testimony were satisfactory. He should therefore have been permitted to testify that he had not been indicted; but the error in excluding this testimony does not require reversal. The almost certain method of prosecution, if there was to be one, would have been to make him a joint respondent here with Wellman; that this was not done was enough to support the inference of total omission. The nonexistence of any indictment against him seems to have been taken for granted; there is no suggestion to the contrary in the record. The jury could hardly have failed to draw the inference that Drueke, if truthful, was trying to deserve leniency, if not immunity. Evidence that he had not in fact been indicted would have been cumulative. He was not asked about his expectation. A respondent is not likely to be seriously prejudiced by excluding formal proof confirmatory of an inference which is hardly in dispute; it is not probable that the argument to the jury against Drueke's credibility on the ground that he was earning immunity failed to convince merely because the formal proof of nonindictment was excluded.

[9] The inquiry concerning material prejudice on this subject must come to the charge. The jury were told that they should consider any motive Drueke might have for testifying falsely. This covered the point generally, and was enough, unless more specific instructions were properly demanded. Except so far as covered by this general statement the court refused a request which asked in material part a positive instruction that a promise of immunity or pardon was to be inferred from nonprosecution. We have examined the several cases cited in support of this request. They use this or similar language; but they speak, we think, of an inference of fact, not of law. This request laid down a rule of law. It was, in effect, that the jury must infer a promise of immunity, instead of that they might do so. Its refusal was not error.

[10] It is also insisted that the court erred in refusing to permit defendant's counsel to cross-examine Richards as to the attitude of the bank and himself concerning immunity to Drueke. The attitude of the bank or of Richards toward Wellman or Drueke was a matter of no importance except in so far as it affected the credibility of the witness. The witness, however, did testify that he knew Drueke had actually committed the forgeries; that this prosecution was commenced against Wellman at the instance of the bank, and that he personally had a very bitter feeling against Wellman. It therefore appears that the defendant had the benefit of this testimony which fully advised the jury as to the attitude of the bank and of this witness toward both Drueke and Wellman.

[11, 12] It is also claimed that the court erred in rejecting the testimony of certain witnesses as to the reputation of Wellman for honesty, truth, and veracity, and particularly as to the witnesses Mehen and

Breisch. It appears upon page 244 of the record that notwithstanding the objection was sustained the witness Mehen testified that Wellman's reputation "for truth and veracity is good as far as I know. That reputation in respect to his honesty and integrity is good as far as I know." The testimony of Breisch, who lived in Lansing, and not in Grand Rapids, was properly rejected by the court, for the reason that he had not shown himself to be qualified as a character witness. But, even if the testimony of Breisch was improperly rejected, the plaintiff in error was not deprived of evidence as to his reputation for honesty, truth, and veracity. Six separate witnesses testified upon that subject. Wellman had lived in Grand Rapids for a number of years. He was president and manager of a large business enterprise. Undoubtedly, if he desired to do so, he could have brought a number of other witnesses who resided in Grand Rapids, who could have readily qualified as character witnesses, without the necessity of calling a witness from Lansing who had not the same opportunity to know what his immediate associates, friends, and neighbors were saying of and about him.

[13] It is further claimed that the court erred in its charge to the jury in that, in effect, it instructed the jury that it must accept the testimony of Drueke as establishing every element of the offense. The charge of the court is not subject to any such construction, and, even if it were, it would be wholly unimportant. There is no dispute in the evidence tending to prove that these bills of lading were forged and counterfeited, and that such forged and counterfeited bills of lading were uttered as alleged in the indictment. These elements of the offenses charged are established beyond a reasonable doubt, not only by the testimony of Drueke and Richards, but also by the forged instruments that were introduced in evidence and are exhibits in this case. The defendant does not deny that these bills of lading were forged and uttered, but, on the contrary, he bases his defense upon the claim that this was done by Drueke without his knowledge and consent, and that at least all but two of these forged bills were issued after he had given positive instructions to Drueke that this practice must stop. For these reasons the court did not err in assuming that these elements of the crime were not only established by the uncontradicted evidence, but not a matter in dispute.

It is said, however, that the court erred in declaring that each one of these transactions was a fraud upon the Old National Bank, instead of leaving that question for the determination of the jury. This is another question upon which there is no substantial dispute in the evidence. It is insisted that "manifestly the Old National Bank could not be defrauded if it knew what was going on, or if it knew such facts as would have apprised it of the character of the transactions." No such claim was made by the defendant during the trial, and there is absolutely no evidence tending to prove that the bank had such knowledge. That Wellman recognized that the bank had been defrauded by substituting these forged bills of lading for the original is evidenced by the testimony of Richards that Wellman promised if he were given an opportunity to work the thing out he would reimburse the bank every dollar that he had taken. Aside from Wellman's statement to

Richards, it is clear from the uncontradicted evidence that the bank did not have any knowledge whatever that forged and counterfeit bills of lading were being substituted for the original and returned to it with the draft. This was a fraud upon the bank, and the court did not err in so instructing the jury.

[14] Nor do we think the charge of the court is susceptible of the construction that, if the jury should find that Wellman had originated the plan that was carried into effect by Drueke with Wellman's knowledge and consent, Wellman could not relieve himself from further criminal responsibility by directing Drueke to stop such practice. The court properly charged, in substance, that, if Wellman originated the scheme, and aided, abetted, and counseled Drueke in the commission of the acts charged, Wellman would be criminally responsible for the forgery and utterance of these fictitious bills of lading by Drueke. That instruction was entirely proper, but it by no means precluded Wellman from proving or the jury from finding that Wellman had entirely withdrawn from these unlawful practices, and had ordered and directed Drueke to discontinue the same. His testimony to that effect was admitted, and the court further charged the jury that in arriving at its verdict it was its duty to consider and weigh all of the evidence that had been admitted in the trial of the case.

[15] It is further claimed that the court erred in refusing to charge in reference to the testimony as to the good reputation of defendant for truth, honesty, and integrity, as requested by the defendant and in the charge given. The court, however, did instruct the jury that it should consider the oral testimony of the witnesses, including the testimony of the so-called character witnesses. "You will take that into consideration, because a man's reputation for good character is one of the best possessions that any man can have. Take into consideration the testimony of those witnesses, giving it such weight and consideration as you believe it to be entitled to, and finally you will reach a verdict in this case based upon all the evidence in the case which under all the circumstances you believe to be true." It is claimed that this does not inform the jury for what purpose it might consider this testimony.

How the failure of the court to limit the application of this evidence to one particular proposition instead of permitting the jury to consider it generally as substantive evidence of defendant's innocence could be prejudicial to Wellman does not clearly appear. In any event, it could not be of such a prejudicial character as would require the reversal of this judgment. Section 269 of the Judicial Code, as amended February 26, 1919 (Comp. St. Ann. Supp. 1919, § 1246).

[16] Request 24, in reference to the implied promise of immunity to an accomplice who is examined as a witness by the government, was properly refused. The court charged the jury that, the witness Drueke having confessed to the commission of the crime charged in the indictment, the jury should scrutinize his testimony in the light of that fact and accept it with caution. This charge not only permitted, but instructed, the jury to consider every ulterior motive that would induce a witness who had confessed his own guilt to testify falsely; but, even if the

court had failed to charge the jury to accept the testimony of Drueke with caution, and scrutinize it in the light of the fact that he had confessed to the commission of the crime, such failure would not have been reversible error. Caminetti v. United States, 242 U. S. 470, 495, 37 Sup. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168.

[17] It is further claimed on behalf of the plaintiff in error that the evidence offered on behalf of the government, if true, does not tend to prove the specific crime charged, and that the court enlarged the scope and effect of this statute relating specifically to the forging and uttering of bills of lading in interstate commerce by combining it with the general statute relating to aiding and abetting.

Section 41 of the Act of 1916 (39 U. S. Statutes at Large, 544 [Comp. St. § 8604u]) provides, in substance, that whoever forges or aids in forging a bill of lading, or utters or aids in uttering a forged and counterfeit bill of lading, shall be guilty of an offense, and shall be punished as therein provided. There is nothing in this statute that limits the manner in which one may aid in the commission of the offense. While the general statute (section 332, Penal Code [Comp. St. § 10506]) includes the words "abet, counsel, command, induce or procure" in addition to the word "aid," nevertheless it is clear that if one abets, counsels, commands, induces, or procures another to forge or utter a bill of lading he is by these acts aiding in the forging and the uttering of forged bills of lading, so that, wholly without recourse to the general statute in relation to aiders and abettors, the language of this statute comprehends any means by which one may aid another in the commission of the crime charged.

There are a number of other assignments of error, but it is impracticable to discuss them all in detail in this opinion. It is sufficient to say that we have carefully examined each and every assignment of error contained in this record, and in the opinion of this court no error has intervened to the prejudice of the plaintiff in error.

For the reasons stated, the judgment of the District Court is affirmed.