UNITED STATES of America, Appellee,

v.

William Theodore LOVELY, Appellant.

No. 8783.

United States Court of Appeals Fourth Circuit.

Argued Jan. 14, 1963.

Decided May 28, 1963.

---

674

Chester E. Wallace, Atlanta, Ga., for appellant.

Marvin L. Smith, Asst. U. S. Atty. (Terrell L. Glenn, U. S. Atty., on brief), for appellee.

Before BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges.

BOREMAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the Eastern District of South Carolina denying a motion of William Theodore Lovely under 28 U.S.C. § 2255 [1] to vacate a life

1. 28 U.S.C. § 2255, in pertinent part, is as follows:

"§ 2255. Federal custody; remedies on motion attacking sentence

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, * * * may move the court

sentence imposed November 24, 1948, which he is now serving. We think the action of the District Court must be affirmed.

Lovely was indicted on a charge of rape and convicted by a jury. The indictment was based upon the admittedly pertinent federal statute and the crime was alleged to have been committed in 1947 on the federal military reservation known as New Fort Jackson, Richland County, South Carolina. Lovely's principal contention is that the trial court lacked jurisdiction of the offense because jurisdiction purportedly ceded by the State of South Carolina over the area comprising New Fort Jackson was not effectively vested in the United States under the provisions of the South Carolina statutes dealing with the cession of jurisdiction to the federal government. He contends that, because of lack of federal jurisdiction, his conviction and sentence were void and are presently subject to attack under 28 U.S. C. § 2255 notwithstanding the fact that he failed to raise the jurisdictional question either at his trial or on a sub-

sequent direct appeal to this court. Section 2255 provides, in substance, that a federal prisoner may seek relief *at any time* by motion to vacate a sentence imposed by a court which was without jurisdiction to impose the sentence. Therefore, we shall consider the question raised as to the trial court's jurisdiction.

In support of his position, Lovely relies primarily upon South Carolina Code (1952), ch. 2, art. 4, §§ 39–81 through 39–83,[2] originally enacted in 1871, purporting to cede concurrent jurisdiction to the United States over so much land as is necessary for general public purposes, but providing that jurisdiction thereby ceded shall not vest until the United States acquires title to the land involved and also causes the evidence of such title to be recorded in "the office where, by law, the title to such land is recorded." It appears to be true, as Lovely argues, that the Government has at no time complied with this requirement by recording in the records of Richland County evidence of its title to the New Fort Jackson area.

which imposed the sentence to vacate, set aside or correct the sentence.

"A motion for such relief may be made at any time."

2. "TITLE 39.
 "CHAPTER 2.
"Consent to Acquisition of Lands by United States Generally.
 "Article 4.
 *"Lands Needed for General
 Public Purposes.*
"§ 39–81. Jurisdiction ceded.

"The jurisdiction of the State is hereby ceded to the United States over so much land as is necessary for the public purposes of the United States; *provided,* that the jurisdiction hereby ceded shall not vest until the United States shall have acquired the title to the lands by grant or deed from the owner thereof and the evidences thereof shall have been recorded in the office where, by law, the title to such land is recorded. The United States is to retain such jurisdiction so long as such lands shall be used for the purposes aforementioned and no longer."
"§ 39–82. Retention of certain jurisdiction; service of process.

"Such jurisdiction is granted upon the express condition that the State shall re-

tain a concurrent jurisdiction with the United States in and over such lands, so far as that civil process in all cases not affecting the real or personal property of the United States and such criminal or other process as shall issue under the authority of the State against any person charged with crimes or misdemeanors committed within or without the limit of such lands may be executed therein in the same way and manner as if no jurisdiction had been hereby ceded."
"§ 39–83. Exemption from taxation.

"All lands and tenements which may be granted to the United States pursuant to the provisions of § 39–81 shall be and continue, so long as the same shall be used for the purposes in said section mentioned, exonerated and discharged from all taxes, assessments and other charges which may be imposed under the authority of the State."

NOTE: All title, chapter, article and section references to the laws of South Carolina, either the quotations in footnotes or as found in the text of the opinion, are taken from the 1952 Code in which year the laws were recodified without change from language of the Code of 1942 in effect in 1947.

At trial the Government introduced in evidence, as proof of asserted federal jurisdiction over the area in question, Petition in Condemnation, Declaration of Taking, Certificate of Clerk of Court as to deposit of funds, the Judgment on Declaration of Taking dated May 5, 1941, and an authenticated copy of a letter dated November 4, 1943, from Henry L. Stimson, Secretary of War, to Honorable Olin D. Johnston, then Governor of South Carolina. The first paragraph of this letter is as follows:

"The laws of the State of South Carolina (an act of the General Assembly of South Carolina approved February 19, 1908 (Act No. 521, Acts of South Carolina, 1908, p. 1127; see also par. (52), sec. 2042, chap. 93, title 23; vol. II (Civil Code), Code of Laws, South Carolina, (1942)) permit the assumption of exclusive Federal jurisdiction over lands within that State acquired by the United States for military and certain other purposes."

The next to the last paragraph of the letter states:

"Accordingly, notice is hereby given that the United States accepts exclusive jurisdiction over all lands acquired by it for military purposes within the State of South Carolina, title to which has heretofore vested in the United States, and over which exclusive jurisdiction has not heretofore been obtained."

The laws, specifically mentioned in the first paragraph of the letter of Secretary of War Stimson, at the time of the offense charged in the indictment, were embodied in South Carolina Code (1952), ch. 2, art. 1, §§ 39–51 through 39–53.[3] The Secretary of War's letter referred also to 40 U.S.C. § 255.[4] Governor John-

---

3. "CHAPTER 2.

"Consent to Acquisition of Lands by United States Generally.

"Article 1.

*"For Custom Houses, Post Offices, etc.*

"§ 39–51. General consent to acquire lands.

"The consent of this State is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the Constitution of the United States, to the acquisition by the United States by purchase, condemnation, or otherwise of any land in this State required for sites for custom houses, court houses, post offices, arsenals or other public buildings whatever or for any other purposes of the government."

"§ 39–52. Jurisdiction over such lands; service of process.

"Exclusive jurisdiction in and over any land so acquired by the United States pursuant to the consent given by § 39–51 shall be, and the same is hereby, ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State. The jurisdiction so ceded shall continue no longer than the United States shall own such lands."

"§ 39–53. Jurisdiction not to vest until title acquired.

"The jurisdiction ceded in any case pursuant to § 39–52 shall not vest until the United States shall have acquired the title to any such lands by purchase, condemnation or otherwise."

Article 1 contains also § 39–54 which is as follows:

"§ 39–54. Exemption from taxation.

"So long as any land acquired by the United States pursuant to the consent given by § 39–51 shall remain the property of the United States, and no longer, such lands shall be and continue exempt and exonerated from all State, county and municipal taxation, assessments or other charges which may be levied or imposed under the authority of this State."

4. The eighth paragraph of 40 U.S.C. § 255, pertinent here, is quoted below:

"§ 255. Title to land to be purchased by United States; acquisition by United States of jurisdiction over lands

\* \* \* \* \*

"Notwithstanding any other provision of law, the obtaining of exclusive jurisdiction in the United States over lands or interests therein which have been or shall hereafter be acquired by it shall not be required; but the head or other authorized officer of any department or independent establishment or agency of the Government may, in such cases and at such times as he may deem desirable, accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial,

ston, without apparent objection, acknowledged receipt of the letter on November 8, 1943.

If the South Carolina statutes upon which Lovely relies to defeat jurisdiction (see footnote 2, sections 39–81 through 39–83) were the only statutes covering the subject of the cession of jurisdiction to and the vesting of jurisdiction in the federal government, we would not hesitate to declare that the court in which Lovely was convicted did not have jurisdiction because of failure of the Government to record evidence of title and we would hold, accordingly, that the motion to vacate the judgment and sentence should have been granted. See Markham v. United States, 215 F.2d 56 (4th Cir. 1954). But the South Carolina statutes set forth in footnote 3, to which the Secretary of War referred in his letter of November 4, 1943, were enacted in 1908 and quite obviously cover the same subject matter as the 1871 statutes upon which Lovely relies.

Section 39–51 provides, in substance, that the consent of the State of South Carolina to the acquisition of lands by the United States by purchase, condemnation or otherwise is given in accordance with art. 1, § 8, cl. 17 of the Constitution of the United States. The constitutional provision upon which the State's consent was based grants power to Congress

> "To exercise exclusive Legislation in all Cases whatsoever, * * * and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; * * * "

In Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091

(1930), it was held that Camp Pike, an army mobilization, training and supply station of the United States, "comes within the words 'forts, magazines, arsenals, dock-yards, and other needful buildings' in the constitutional provision." 281 U.S. 652, 50 S.Ct. at 456. Lovely argues that it is significant that the South Carolina Legislature omitted from section 39–51 any reference to "forts" as one of the purposes for which land might be acquired by the United States and that this omission must have been deliberate, indicative of intent to confine the provisions to small areas and less than would be required for large military installations. It is true that "forts," included in art. 1, § 8, cl. 17 of the Constitution, were not specifically mentioned in the state statute (section 39–51) but the statutory phrases—"or other public buildings whatever or for any other purposes of the government"—are sufficiently comprehensive to include forts and military installations such as New Fort Jackson, and equally as comprehensive as the phrase, "for the public purposes of the United States," found in section 39–81 which Lovely asserts is exclusively applicable. Cf. In re Military Training Camp, 260 F. 986 (E.D.Va. 1919).

In Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 83 L.Ed. 455 (1939), a prisoner of the State of Georgia filed a petition for a writ of habeas corpus. He had been tried in a federal court and convicted of murder committed in a national military park in the State of Georgia and it was his contention that the court lacked the exclusive jurisdiction then required by the United States Criminal Code. The Supreme Court held that a 1927 Georgia general statute, Laws 1927, p. 352, purporting to cede exclusive jurisdiction to the United States over any land "which has been or may hereafter be acquired

not theretofore obtained, over any such lands or interests as he may deem desirable and indicate acceptance of such jurisdiction on behalf of the United States by filing a notice of such acceptance with the Governor of such State or in such other manner as may be pre-

scribed by the laws of the State where such lands are situated. Unless and until the United States has accepted jurisdiction over lands hereafter to be acquired as aforesaid, it shall be conclusively presumed that no such jurisdiction has been accepted."

for custom-houses, post-offices, arsenals, other public buildings whatever, or for any other purposes of government" was effective to vest in the United States exclusive jurisdiction over the military park. The similarity of the language of the Georgia statute considered in the Bowen case and the language of the South Carolina statute, section 39–51, is striking. In Bowen v. Johnston, supra, 306 U.S. at pages 29 and 30, 59 S.Ct. at page 447, the Court stated:

"The argument is strongly pressed that as this is a general act and there is no express repeal of, or specific reference to, the earlier special acts relating to the lands within the Park, it should not be regarded as yielding the jurisdiction which the earlier acts reserved to the State. But we find that the administrative construction is to the contrary. The administration of the Park was placed with the War Department and it appears from its files that on July 14, 1930, upon a review of the pertinent legislation, the Judge Advocate General gave an opinion that the Act of 1927 'vests exclusive jurisdiction in the United States over that part of the Chickamauga and Chattanooga National Military Park located within the State of Georgia' and that violations of law occurring on the ceded lands are enforceable only by the proper authorities of the United States. As this administrative construction is a permissible one we find it persuasive and we think that the debated question of jurisdiction should be settled by construing the Act of 1927 in the same way."

The Secretary of War, in his letter of November 4, 1943, prefaced his acceptance of jurisdiction over all lands acquired by the United States for military purposes within the State of South Carolina by a reference to the cession laws of the State of South Carolina deemed by him pertinent and which permitted the assumption of exclusive federal jurisdiction. This letter was received by the Governor of the State of South Carolina and it does not appear that there was any objection by him to any portion thereof. The administrative construction placed upon the Georgia statute considered in Bowen was found by the Supreme Court to be persuasive. We find the construction by the Secretary of War of the applicability of specific South Carolina statutes, apparently accepted by the Governor of South Carolina, to be also quite persuasive.

The United States acquired title to the land involved in the instant case by condemnation proceedings in the year 1941, and the Secretary of War accepted jurisdiction over said land by his letter to the Governor of South Carolina of November 4, 1943. The letter was written pursuant to the requirements of the eighth paragraph of 40 U.S.C. § 255, set forth in our footnote 4. The provision of that section creating the presumption against acceptance of jurisdiction was added by the amendment of February 1, 1940, to section 355 of the Revised Statutes and applies only to lands thereafter to be acquired (54 Stat. 19). Thus, the Secretary of War was acting pursuant to the provisions of the pertinent federal law in accepting jurisdiction over the New Fort Jackson area.

■ Notwithstanding Lovely's asserted reliance upon the exclusive applicability of section 39–81 and its related statutes in article 4 of the 1952 South Carolina Code, he argues that section 39–81 is unconstitutional and not within the intent and purpose of art. 1, § 8, cl. 17 of the Constitution of the United States which grants Congress legislative authority over all places purchased with the consent of the Legislature of the State in which such places are located. He contends that if a State may make a "carte blanche" concession of this kind, it may destroy its sovereignty by making it possible for the federal government to usurp jurisdiction over the entire state. This is an ingenious but not a novel argument. As was said in Yellowstone Park Transp. Co. v. Gallatin County, 31 F.2d 644, 645 (9th Cir., 1929), " * * * Such a con-

tingency is possible, but improbable, and the situation must be met when it arises. Suffice it to say that no such question is here involved." Although Lovely's contention in this particular would be equally applicable to sections 39–51 through 39–54, the same answer would dispose of it.

It is Lovely's further contention that the language used in still another South Carolina statute, section 39–61 of article 2 of the 1952 Code,[5] indicates that the legislative intent was to limit the provisions of sections 39–51 through 39–54 to very small areas, much less than two thousand acres, and that the latter statutes could not be construed as applicable to the acquisition of title to or jurisdiction of a thirty-six thousand acre fort or military installation such as New Fort Jackson. Although the provision found in section 39–61 was in existence at the time of Lovely's offense, it was by its terms limited to land purchased for arsenals and magazines. However, our examination reveals that section 39–61 was repealed by the South Carolina Legislature in 1961 without any official evidence or indication of legislative purpose in so doing. Counsel for Lovely failed to mention or explain this repeal. Although this court is quite frankly at a loss to determine its original purpose in the legislative scheme, it is obvious that section 39–61 was not intended to have the effect attributed to it by Lovely. What the Legislature *might* have intended was a limitation on the size of arsenals and magazines within the State, a perfectly logical and understandable precaution; but to use the words "in addition" with respect to what is obviously a comprehensive and unlimited grant of power is a meaningless contradiction of terms. Thus, this particular contention of Lovely is completely devastated by the repeal of section 39–61 and the retention of sections 39–51 through 39–54.

There were, therefore, at the time of Lovely's offense, two possibly applicable integrated sets of statutory provisions, each set grouped together under a numbered article, sections 39–51 through 39–54 being incorporated in article 1, and sections 39–81 through 39–83 incorporated in article 4. The subject matter covered by these two articles is identical, both purporting to cede to the United States jurisdiction over any land acquired by it in South Carolina for any public purpose, both retaining jurisdiction over such land for the service of legal process, both providing for a condition precedent to the actual vesting of federal jurisdiction and both rendering such land exempt from state, county and municipal taxation. The only operational differences between the two articles are (1) that under article 4 (section 39–81) the prerequisites to the vesting of federal jurisdiction are the acquisition of title and the recording of the evidence of title, whereas under article 1 (section 39–53) the only such prerequisite is the acquisition of title; and (2) that under article 4 (section 39–81) federal jurisdiction obtains only so long as the lands are used for public purposes of the United States, whereas under article 1 (section 39–52) the jurisdiction thereby ceded is to continue so long as the United States owns such lands.

 It is a universally accepted rule of statutory construction that where a later act purports to cover the whole subject covered by an earlier act, embraces new provisions, and plainly shows that it was intended not only as a substitute for the earlier act but also to cover the whole subject involved and to prescribe the only rules with respect

---

5. "TITLE 39.
 "Article 2.
 *"Arsenals and Magazines*
"§ 39–61. Land purchased for arsenals and magazines.
 "In addition to the authority granted with respect to arsenals by article 1 of this chapter the United States or such

person as may be by it authorized may purchase in any part of this State that may be thought most eligible the fee simple of any quantity of land, not exceeding two thousand acres, for the purpose of erecting arsenals and magazines thereon."

thereto, the later act operates as a repeal of the earlier act even though it makes no reference to the earlier act. Chase v. United States, 256 U.S. 1, 41 S.Ct. 417, 65 L.Ed. 801 (1921); Gibson v. United States, 194 U.S. 182, 24 S.Ct. 613, 48 L. Ed. 926 (1904); The Paquete Habana, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900); District of Columbia v. Hutton, 143 U.S. 18, 12 S.Ct. 369, 36 L.Ed. 60 (1892); King v. Cornell, 106 U.S. 395, 1 S.Ct. 312, 27 L.Ed. 60 (1882); Murdock v. Memphis, 20 Wall. 590, 87 U.S. 590, 22 L.Ed. 429 (1874); United States v. Tynen, 11 Wall. 88, 78 U.S. 88, 20 L. Ed. 153 (1870); Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819 (6th Cir.1953). We are convinced that by enacting in 1908 the statutes comprising article 1 (sections 39–51 through 39–54), the Legislature of South Carolina intended to and did completely cover the subject of cession and vesting of federal jurisdiction over land within the state, previously covered by the statutes comprising article 4 (sections 39–81 through 39–83) which had been in effect since 1871, and that the Legislature's intention in so doing was to substitute the former for the latter, thereby effectively repealing by implication the statute upon which Lovely so heavily relies. The superseding statute does not require the recordation of the evidence of title nor, in fact, the giving of any species of notice, but provides only that the jurisdiction thereby ceded "shall not vest until the United States shall have acquired the title to any such lands by purchase, condemnation or otherwise." As we have pointed out, the title to the land in question in the instant case was acquired by the United States by condemnation pursuant to statutory permission granted by the State of South Carolina and exclusive jurisdiction, ceded by the State, over the New Fort Jackson area was effectively accepted by the Secretary of War in 1943. The retention by the State of the right to *serve* its civil and criminal *process* on the federal lands, as in section 39–52, is not effective to prevent cession of *exclusive criminal jurisdiction* to the federal government.

Lovely further contends that an instruction [6] given by the judge at the trial deprived him of his constitutional right to a jury trial on the critical factual issue of whether the locus of the crime was within the boundaries of the New Fort Jackson area and that this deprivation is a sufficient ground for vacation of his sentence. It is to be noted that Lovely was first tried and convicted in 1947 but on appeal to this court the judgment of conviction was reversed and a new trial ordered because of errors in the introduction of evidence and in the court's charge to the jury on a point not relevant here.[7] The defendant was retried in 1948 and again appealed his conviction to this court on grounds having no pertinency to this proceeding. However, this court affirmed the second conviction and sentence.[8] On the present appeal we have reviewed the record evidence in our effort to give fair consideration to Lovely's claim of violation of his constitutional right. Our conclusions with reference to the evidentiary establishment of the locus of the crime are stated in the discussion which follows.

The evidence disclosed that the offense charged in the indictment was committed on Sunday evening sometime after eleven o'clock. Defendant, who was then an officer stationed at Fort Jackson, and the prosecuting witness had spent the evening at one of the Officers' Clubs at the Fort. They left in defendant's car and, according to his own story, drove "out across the Fort" despite the request of the prosecutrix, according to her testimony, that she be taken to her residence in Columbia. On the following Tuesday

6. The court charged the jury that if the crime was committed at all, then "it was on land of Fort Jackson, a United States Military Reservation, in Richland County, South Carolina. That brings the alleged crime within the jurisdiction of this Court."

7. Lovely v. United States, 169 F.2d 386 (4th Cir. 1948).

8. Lovely v. United States, 175 F.2d 312 (4th Cir. 1949), cert. denied, 338 U.S. 834, 70 S.Ct. 38, 94 L.Ed. 508.

Miss McDaniel, who had reported the alleged rape to county officials, accompanied by officers and a civil engineer, undertook to search out the place where she had been taken by the defendant and where the crime was committed. She was unfamiliar, except in a very general way, with the area but she vividly recalled that, shortly after driving away from the Officers' Club, the defendant had stopped his car on an isolated sandy road. After exploring the area for some time, the prosecutrix was able to positively identify the spot where the car had been parked, the tire marks in the road, the footprints left in the sand where she had struggled with the defendant, where she ran after escaping from him, where he overtook her and where he carried her back to the car. Photographs were taken of the scene, showing the tire marks and footprints, and were introduced in evidence. The civil engineer, who was connected with Fort Jackson and who was familiar with the area and the boundaries of the government military reservation, marked on a map or plat the spot which had been identified as the place where the offense was said to have been committed. This spot was well within the boundaries of Fort Jackson. The plat was introduced in evidence.

At the first trial Lovely admitted that the locus of the alleged offense as proved by the prosecution was correct.[9] Upon cross-examination of the prosecuting witness defense counsel, referring to events occurring subsequent to the crime, recognized that the place of the alleged offense was Fort Jackson as evidenced by his phrasing of the following question: "Mrs. [sic] McDaniel, *on the way home from Fort Jackson*, didn't you make the statement to Lieutenant Lovely * *?" (Emphasis supplied). Defendant admitted having had intercourse with the prosecutrix but his *sole* theory of defense was that she had consented.

At the second trial evidence of the locus of the crime, substantially the same as that presented at the first trial, was introduced by the prosecution. Upon direct examination, the defendant described the place of the alleged offense, virtually corroborating the Government's evidence in that regard. He testified with reference to leaving the scene of the crime and driving to the public highway leading into Columbia: "And, the way we went coming back from that spot, we came right through the middle of Fort Jackson—through two military police gates * * * No, I believe one M. P. gate is all. There was one M. P. gate that we did come through." Upon cross-examination concerning the photographs which were again in evidence, the defendant did not deny that the alleged offense took place on Fort Jackson at the site fixed by the Government's witnesses but questioned only the number and location of the footprints and scuff marks appearing in the photographs.[10] This testimony of the defendant with reference to

9. On direct examination by his own counsel, Lovely testified as follows:
"Q. Where did you go, Lieutenant?
"A. We drove out across the fort and out by the main officers' club. I showed her where the place was * * *.
"Q. This spot on the map—I won't bother to get the map that they testified that you went to—you admit, do you not, that you went there?
"A. Yes, we did. We drove down there. I couldn't say the exact distance. We pulled off a highway down this dirt road a short way, and the car was sort of slipping in the sand a little. I pulled in the side road, backed up and almost got stuck, pulled out and parked."

10. The defendant denied that he and the prosecutrix struggled in the sandy road near the car but admitted that she ran down the road and away from the car. He stated that he went to her, picked her up and carried her back to the car but contended that he did so only after she called to him and complained that she had twisted her ankle. Typical of his statements are the following (it will be noted that there were two or more photographs in evidence but they are not a part of the record on appeal):
"Well, this photograph here is not the scene. It could be the spot, but a lot more has been added to that photograph."
"The tire print on this photograph here is scuffed out by footprints. And, we were not out behind the car at any time except when I walked around be-

these footprints and scuff marks forms the entire basis of the issue now sought to be raised by Lovely concerning the court's instruction as to the locus of the crime. Again, at the second trial, the *sole* theory of defense was based upon defendant's claim of consent by the prosecuting witness. In this context it is clear that the defendant's statements with reference to the number and location of footprints and scuff marks were intended to contradict Miss McDaniel's version of the details of the crime and to persuade the jury that someone had made additional footprints and scuff marks to lend support to her story of a struggle, her escape and recapture.

At each trial the judge told the jury, in substance, that if a crime was committed at all, it occurred on lands of Fort Jackson which brought the crime within the jurisdiction of the court. At neither trial was there any objection to this charge. At neither trial was there a request for any instruction in this regard although, at the court's invitation, counsel presented proposed instructions pertaining to other matters, some of which were then read to the jury. This alleged error, asserted for the first time in this proceeding, was not raised on either of the first two appeals to this court although at both trials and on both appeals the defendant was represented by competent counsel of his own choosing. At neither trial did the defendant attempt to show that the alleged crime was committed on lands outside the boundaries of Fort Jackson. At the hearing held by the District Court on the defendant's motion to vacate judgment, there was no such showing.

Under other circumstances, we might well find justification for holding that the trial judge erred in his instruction to the jury concerning the locus of the crime. Certainly would this be so had there been even the vaguest question, or the slightest uncertainty or doubt created by the evidence as to the place of the commission of the crime.[11] If it were to be held that, as a matter of preferred procedure, the trial court should ordinarily submit such a factual issue to the jury, the record before us here would not support a finding that the accused was prejudicially denied his constitutional right to a trial by jury as to this clearly established and uncontroverted fact.

Prior to the recent decision of the Supreme Court in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the principle that neither section 2255 nor habeas corpus is available as a substitute for an appeal was generally accepted and had been repetitively stated by the courts. However, it seems clear from the Noia decision that the Court

---

hind the car and relieved myself. And, the footprints have scuffed out all these tire prints on this photograph, showing that these footprints here was put there after the car was there."

"It could be the scene but there's been something added to it. There is more footprints than it should be."

In response to a question as to whether he denied that one of the photographs showed the spot in the road where he picked up the prosecutrix after she ran away from him, defendant answered:

"I don't know if this does or not, because it was dark there that night, and I had no way of seeing. But, the ground where I picked Miss McDaniel up, I'm quite positive, was not scuffled this bad."

11. We note that the procedure followed by the trial judge in instructing the jury re-garding a fact which is clearly uncontradicted and undisputed is not without precedent and has been upheld where justified by the record. See Malone v. United States, 238 F.2d 851 (6th Cir. 1956); United States v. Jonikas, 197 F.2d 675 (7th Cir. 1952), cert. denied, 344 U.S. 877, 73 S.Ct. 171, 97 L.Ed. 679; Nordgen v. United States, 12 Alaska 671, 181 F.2d 718 (9th Cir. 1950); Wellman v. United States, 297 F. 925, 932 (6th Cir. 1924). Compare, Roe v. United States, 287 F.2d 435 (5th Cir. 1961), cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29; Brooks v. United States, 240 F.2d 905 (5th Cir. 1957); United States v. Gollin, 166 F.2d 123 (3d Cir. 1948), cert. denied, 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151.

intended to modify that principle although we do not read into that decision an intention to strip the federal courts of all discretion to deny relief in a collateral proceeding where, without justifiable reason or excuse, a prisoner has failed to take advantage of the readily available procedures necessary to protect himself at trial or on appeal. Under the circumstances in the Noia case (habeas corpus), the Court found justification for the prisoner's deliberate failure to appeal his state court conviction for murder, namely, the fear of imposition of the death penalty in event of a second conviction.

In the instant section 2255 proceeding, after two trials in each of which the same error is alleged to have occurred, Lovely now asserts the unqualified right to challenge the trial court's instruction. Obviously, this case involves no probability of a violation of constitutional right or miscarriage of justice comparable to that under consideration in Fay v. Noia, supra. No "exceptional circumstances" affecting federal-state relations arise from the purely factual determination of the locus of this crime. Cf. Bowen v. Johnston, 306 U.S. 19, 27, 59 S.Ct. 442, 83 L.Ed. 455 (1939).

 In view of the evidence upon which the challenged instruction at each trial was based, the repeated reliance on a single theory of defense, and the proceedings on both of the prior appeals, we find no merit in the present contention that the court erred, to Lovely's prejudice, in instructing the jury concerning the locus of the crime. We are of the opinion that the District Court is required to exercise its sound discretion in the light of the facts and circumstances in each case where relief is sought under section 2255. Lovely offers no reason or excuse, plausible or otherwise, for failing to follow the procedures provided for the orderly adjudication of his federal defenses. He points to no possibility or expectation of benefit or advantage to be derived by him from a third trial, if one were ordered.

We have carefully considered Lovely's other contentions but find them to be without merit. We find no abuse of discretion by the District Court in denying petitioner the relief for which he prays.

Affirmed.