UNITED STATES of America,
Plaintiff-Appellant,

v.

LEWISBURG AREA SCHOOL DISTRICT
et al., Defendants-Appellees.

No. 75–2282.

United States Court of Appeals,
Third Circuit.

Argued April 22, 1976.
Decided July 16, 1976.

---

Louise O. Knight, Lewisburg, Pa., for the Lewisburg Area School Dist., Union County, Pennsylvania, the Bd. of School Directors of the Lewisburg Area School Dist.

Paul E. Johnson, Mifflinburg, Pa., for the Union County Bd. of Assessment (Union County Bd. of Commissioners), Union County, Pennsylvania, Kelly Township Tax Collector, and Union County Tax Assessor.

Paul W. Brann, Lewisburg, Pa., for the Union County Treasurer.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Gary R. Allen, Richard Farber, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant; S. John Cottone, U. S. Atty., Scranton, Pa., of counsel.

Before ALDISERT, FORMAN and WEIS, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

The United States brought suit in the United States District Court for the Middle District of Pennsylvania, naming as defendants the Lewisburg Area School District, Union County, wherein it is situated, and individual officers of each (hereafter called the School District) to obtain a declaration that the Constitution and laws of the United States prohibit the imposition of certain local taxes on the federal employees and their dependents who reside on the federal enclave known as the Lewisburg Federal Penitentiary, and to seek preliminary and permanent injunctions against the assessment and collection of those taxes. The jurisdiction of the District Court was invoked pursuant to 28 U.S.C. § 1345 and § 2201. The taxes in question are a per capita tax of $5 imposed by the Lewisburg Area School District, a per capita tax of equal amount imposed by Union County, and an occupation tax imposed by the Lewisburg Area School District.

The United States claimed that pursuant to Art. I, § 8, cl. 17 of the Constitution[1] and to 61 P.S. § 355,[2] exclusive jurisdiction over the enclave is vested in the United States; that no tax can be imposed on residents of the enclave except by consent of the United States; and that the United States has not consented to the taxes in question.[3]

The School District filed a motion to dismiss on the grounds first that the court was without jurisdiction because the United States lacked standing to bring suit, had not exhausted state remedies as required by 28 U.S.C. § 1341 before a federal court could enjoin the collection of a state tax, and had not sought a three-judge court; and secondly that the United States had failed to state a claim on which relief could be granted. The District Court granted the motion to dismiss on the grounds that the United States lacked standing to maintain the action, but went on to consider the merits of the case and to conclude that Pennsylvania, in ceding the Lewisburg enclave to the Federal Government, had reserved the right to tax residents of that enclave and that the United States therefore could not prevail even if it did have standing. Finally, the court held that the occupation tax constituted an "income tax" within the meaning of the Buck Act, 4 U.S.C. §§ 105–110, and therefore, by virtue

1. Art. I, § 8, cl. 17:

    "Congress shall have Power . . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

2. 61 P.S. § 355:

    "Exclusive jurisdiction over the land so purchased and to be purchased, is hereby ceded to the United States by the Commonwealth of Pennsylvania, and said lands shall be exempt from the payment of all taxes, state and local: Provided, That the Commonwealth of

Pennsylvania shall retain concurrent jurisdiction with the United States over the lands so acquired by the United States, as far as necessary, for the purpose of serving all civil and criminal processes which may be issued under the authority of the Commonwealth in causes arising without the area so acquired." 1931, March 26, P.L. 7, No. 4, § 3.

3. The stipulation of facts agreed on between the parties and made part of the record below included a provision that the plaintiff did not challenge the right of defendants to assess and collect the taxes in question from federal employees residing off the federal enclave within the jurisdiction of defendants, or the right of the defendants to impose and collect from employees residing in the federal enclave a 1% earned income tax which came clearly within the consent given by the Buck Act, 4 U.S.C. §§ 106, 110.

of the provisions of that Act, the United States had consented to the imposition of the tax.[4]

We have jurisdiction pursuant to 28 U.S.C. § 1291. The order of the District Court before us on review is the order dismissing the complaint. It is clear from the opinion that this order is based not only on a finding by the District Court that the United States lacked standing, but also on the Court's analysis of the merits.

■ The court had before it matters beyond the pleadings in the case, including a stipulation of facts and exhibits; it considered affirmative defenses not specifically referred to in the motion to dismiss. Thus the motion to dismiss for failure to state a claim was in essence treated by the District Court as a motion for summary judgment. Neither party makes any objection to this treatment or alleges any factual controversy. The dismissal for failure to state a claim should more properly have been entered by the District Court as an order for summary judgment (Fed.R.Civ.P. 12(b)(6) and 56) and we review it as such.[5]

## I STANDING

■ The United States claims that the actions of the School District in assessing and levying the taxes violate its rights under the Constitution to sovereignty over the land ceded by Pennsylvania for the federal enclave at Lewisburg. Against this claim the School District argues that the exclusive jurisdiction of the United States extends by the terms of the Pennsylvania cession statute only to the ceded *lands* and *not to the persons* residing thereon, and that therefore no interest of the United

States is being infringed. This argument goes not to standing but to the merits. "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).[6]

In *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court quoted *Flast v. Cohen, supra,* 392 U.S. at 101, 88 S.Ct. at 1953, that "In terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution," and determined that the only two questions relevant to an inquiry into standing are whether the challenged action caused plaintiff injury in fact, economic or otherwise, and whether the interest sought to be protected by complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

■ It has long been established that the United States may bring suit to protect its sovereign interest notwithstanding the lack of any immediate pecuniary interest in the outcome of the litigation.[7] In cases brought by the United States to enjoin sales, use or personal property taxes, imposed by States allegedly in contravention of the Soldiers & Sailors Relief Act, the United States has been held to have standing to protect the statutory right of servicemen to be free of allegedly discriminatory taxes.[8] The Supreme Court has recently

4. For Opinion of the District Court, see *United States v. Lewisburg,* 398 F.Supp. 948 (1975).

5. *Central Contracting Co. v. Maryland Casualty Co.,* 367 F.2d 341 (3d Cir. 1966). See also *Hanna v. U. S. Veterans Admin. Hospital,* 514 F.2d 1092 (3d Cir. 1975); *Williams v. Pacific Maritime Assoc.,* 384 F.2d 934 (9th Cir. 1967), cert. den., 390 U.S. 987, 88 S.Ct. 1181, 19 L.Ed.2d 1290.

6. See also *Simon v. Eastern Kentucky Welfare Rights Organization,* —— U.S. ——, ——, 96

S.Ct. 1917, 1925, 48 L.Ed.2d 450, 44 L.W. 4724, 4728 (1976).

7. *United States v. Allegheny County,* 322 U.S. 174, 191–192, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); *In re Debs,* 158 U.S. 564, 584, 15 S.Ct. 900, 39 L.Ed. 1092 (1895); *United States v. City of Glen Cove,* 322 F.Supp. 149, 152 (E.D.N.Y. 1971), aff'd, 450 F.2d 884 (2d Cir. 1971).

8. *United States v. County of Champaign,* 525 F.2d 374 (1975, 7th Cir., Stevens, J.); *United States v. Arlington County,* 326 F.2d 929 (4th

reaffirmed that the United States would have standing to sue against the levy of state taxes on Indians.[9] Other cases have upheld the standing of the Government to protect the derivative right of its contractors to be free from state taxation.[10] The School District argues that these cases are distinguishable; that the Government had standing therein not to protect the soldiers from taxation but to ensure that the provisions of the Soldiers & Sailors Relief Act with regard to servicemen's domicile remained intact; that the Government has a special interest in the protection of Indians; and that the involvement, financial and otherwise of the Government with its contractors all form distinguishable bases of standing in the cited cases.

■ We do not have to decide whether the Government would have standing in this case if the only interest that it asserted was the protection of the residents of the federal enclave from taxation. The Government makes clear that the heart of this controversy is not merely concern for the federal employees and their dependents residing in the federal area at Lewisburg but the jurisdictional status of the enclave. The interest which the Government seeks to protect is its own exclusive rights as sovereign, and the injury it alleges is a trespass against those sovereign rights.

The United States by act of the Pennsylvania Legislature was ceded certain lands over which it claims exclusive jurisdiction. It seems clear that the United States has sufficient interest in protecting that jurisdiction to apply to the federal court for a declaration as to whether the actions of the local taxing bodies in assessing and attempting to collect taxes in that territory violate its sovereign rights. The acts of the School District against the alleged sovereignty state a claim of injury in fact. The interest sought to be protected is within the constitutional guarantee of Art. I, § 8, cl. 17. Hence we reverse the District Court and find that the United States had standing to sue.

## II EXCLUSIVE JURISDICTION

· The Lewisburg enclave was purchased by the United States with the consent of the Pennsylvania Legislature for a purpose which brings it within Art. I § 8 cl. 17.[11] The Pennsylvania Legislature consented to the purchase and ceded jurisdiction over the purchased land.[12] About these facts there is no dispute. At issue between appellant and appellee is whether Pennsylvania ceded only jurisdiction to tax the land and retained jurisdiction to tax persons who reside on the land.

■ Exclusive jurisdiction as used in Article I means that not only is federal property immune from taxation but that state laws which have not been explicitly or implicitly adopted by the United States, including tax laws to which the United States has not consented, are ineffective over persons or property on the enclave.[13]

Cir. 1964); see also *Sullivan v. United States*, 395 U.S. 169, 170, 89 S.Ct. 1648, 23 L.Ed.2d 182 fn. 2 (1969).

**9.** *Moe v. Confederated Salish & Kootenai Tribes*, —— U.S. ——, ——, 96 S.Ct. 1634, 1642, 48 L.Ed.2d 96, 44 L.W. 4535, 4539 (1976).

**10.** *United States v. Nevada Tax Commission*, 439 F.2d 435 (9th Cir. 1971); *United States v. Bureau of Revenue*, 291 F.2d 677 (10th Cir. 1961).

**11.** See fn. 1 *supra*.

**12.** 61 Purdon Statutes § 355, see fn. 2 *supra*. The cession act was passed in 1931 prior to the passage of 40 U.S.C. § 455 which made formal assent by the United States to the acquisition of jurisdiction a final and necessary step. Be-

fore 1940 the acceptance of jurisdiction by the United States was presumed in the absence of circumstances indicating dissent. *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 528, 5 S.Ct. 995, 29 L.Ed. 264 (1885). P. Twitty, The Respective Powers of the Federal and Local Governments Within Lands Owned or Occupied by the United States, 13 (1944).

**13.** *S. R. A. Inc. v. Minnesota*, 327 U.S. 558, 562–3, 66 S.Ct. 749, 90 L.Ed. 851 (1946). See also *Silas Mason Co. v. Tax Commissioner*, 302 U.S. 186, 197, 58 S.Ct. 233, 82 L.Ed. 187 (1937); *Surplus Trading Co. v. Cook*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930); *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885).

The United States can condemn and occupy state land without any cession of jurisdiction by the state. However, such ownership and occupancy without consent or a cession of jurisdiction by the state legislature does not limit the jurisdiction of the state over the lands, except that the state may not exercise jurisdiction directly over the United States or its instrumentalities. *Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264 (1885). The cases relied upon by the School District, in which the validity of a tax was held to depend on whether it fell directly on the United States or its instrumentalities or interfered with its activities, all concern circumstances where there had been no surrender by the state of jurisdiction over an area.[14] None of these cases are useful to our consideration of the limitation on state taxing power in a federal enclave purchased by consent of the state legislature with a concurrent cession of jurisdiction by the state.

Where there is a purchase by the United States for an Art. I § 8 cl. 17 purpose and a cession by the state of exclusive jurisdiction, this jurisdiction can still be qualified either by the state, at the time when the land is purchased and the jurisdiction ceded, or by consent of the United States to the exercise of certain state laws within the enclave.[15] Whether the consent given by Congress in the Buck Act, 4 U.S.C.

105 *et seq.*, covers the taxes at issue here is discussed in Part III below.

The right of the state to qualify its cession of jurisdiction was upheld in *James v. Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937). A West Virginia statute ceded the United States concurrent jurisdiction over land acquired to build dam locks and dams on the Kanawha and Ohio Rivers. The Supreme Court held that retention of concurrent jurisdiction by West Virginia did not violate Art. I § 8 cl. 17. The Court reasoned that a state may refuse its consent, in which case, although the United States may take by eminent domain, the state retains all jurisdiction which is not inconsistent with the governmental purpose for which the property was acquired; and that therefore the state may equally qualify its cession of jurisdiction by reservations not inconsistent with the government use. In *James*, the Court found that the tax which West Virginia sought to impose did not operate to deprive the United States of its enjoyment of the property for the purpose for which it was acquired, and that since West Virginia had retained concurrent jurisdiction, the tax was valid.

Since *James*, the right of a state to qualify its cession of jurisdiction and to grant less than exclusive jurisdiction has been uncontroverted.[16] The School District argues, and the District Court seems to have agreed, that the exclusive jurisdiction

14. See *Penn Dairies, Inc. v. Milk Control Commission*, 318 U.S. 261, 267, 63 S.Ct. 617, 87 L.Ed. 748 (1943), where the parties conceded that there had been no surrender of state jurisdiction or authority over the area; *Helvering v. Mountain Producers Corp.*, 303 U.S. 376, 58 S.Ct. 623, 82 L.Ed. 907 (1938), involving a claim for immunity from federal taxation by a corporation claiming to be an instrumentality of state government; *Indian Territory Illuminating Oil Co. v. Board of Equalization*, 288 U.S. 325, 53 S.Ct. 388, 77 L.Ed. 812 (1933); *Educational Films Corp. v. Ward*, 282 U.S. 379, 51 S.Ct. 170, 75 L.Ed. 400 (1931), concerning the taxability of royalties from United States copyrights.

15. Examples of state law made applicable within federal enclaves by Act of Congress include: the Federal Assimilative Crimes Act, 18 U.S.C.

§ 13 which makes punishable acts committed within a federal enclave which are not punishable under any Act of Congress but would be punishable under the laws of the state within which the enclave is situated; 26 U.S.C.A. § 3305(d) by which the United States consented to enforcement by states of their unemployment compensation laws within the federal enclaves; and 40 U.S.C. § 290 by which Congress extended to the states, within whose exterior boundaries such enclaves are situated, the power and authority to enforce their workmen's compensation laws.

16. *Paul v. United States*, 371 U.S. 245, 265, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938); *Kiker v. Philadelphia*, 346 Pa. 624, 31 A.2d 289 (1943), *cert. den.*, 320 U.S. 741, 64 S.Ct. 41, 88 L.Ed. 439.

which Pennsylvania ceded was jurisdiction over lands and buildings only, and not over the persons residing thereon.

The cession acts collected in Twitty [17] show that the ordinary language of such statutes, as in the one at issue here, cedes jurisdiction over the lands, usually with a reservation of concurrent jurisdiction to serve civil and criminal process, although some statutes also reserve power to tax persons and corporations residing within such areas, and some statutes cede only a concurrent jurisdiction. Where the statute cedes jurisdiction over lands to the United States, the natural meaning of these words has been taken to include the right to exercise jurisdiction within the purchased territory and thus the right to levy taxes on persons and personal property as well as on land. [18]

■ The School District argues, however, that the statute in explicitly stipulating that "said lands shall be exempt from the payment of all taxes, state and local," implies a reservation of the power to tax *persons* residing on the property. We cannot agree. The state in the next sentence writes a very explicit reservation of concurrent jurisdiction to serve process. In numerous cession acts Pennsylvania has explicitly reserved the right to tax property, persons and franchises when ceding jurisdiction over parcels of land to the United States. [19] When Pennsylvania ceded the land for the Lewisburg penitentiary, no such explicit reservation was made. Although a state can qualify the exclusive jurisdiction which it cedes to the United States over land purchased for an Art. I § 8 cl. 17 purpose, it has the burden to do so explicitly. [20] We are therefore led to the conclusion that the District Court erred in finding that Pennsylvania ceded only jurisdiction to tax lands and buildings and retained jurisdiction to tax the persons residing thereon.

## III  THE BUCK ACT

Our conclusion that Pennsylvania did not qualify its grant of exclusive jurisdiction over the land purchased for the federal penitentiary at Lewisburg by any reservation of jurisdiction means that the School District had no authority to impose the taxes at issue unless the United States had consented to their imposition.

By the Buck Act, 4 U.S.C. §§ 105–110, Congress in 1940 gave consent to the levy and collection of various taxes in Federal areas. The School District concedes that the provisions of the Act cannot be construed to cover the per capita taxes contested here, but they argue that the "occupation" tax at issue is in fact an income tax,

17. P. Twitty, The Respective Powers of the Federal and Local Government Within Lands Owned or Occupied by the United States (1944).

18. In *Surplus Trading Co. v. Cook*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930), it was held that the County could not impose a tax on personal property belonging to the trading company which was physically within the federal enclave on the date the taxes were assessed. In *Johnson v. City & County of Denver*, 527 P.2d 883 (1974), the Supreme Court of Colorado held that the City of Denver could not impose a head tax on persons who worked in the federal enclave.

19. See, e. g. 74 P.S. §§ 56, 112.4, 120.4, 120.19 (1971). The retention of jurisdiction to levy taxes appears to be found in Pennsylvania cession statutes only after *James v. Dravo Contracting Co., supra*, affirmed the legality of such a practice.

20. Jurisdiction over Barksdale Air Force Base was ceded by Louisiana to the United States in a statute which contained the provision that "The property shall be exempt from all taxation, assessments or charges levied under the authority of the state." Although in *Mississippi River Fuel Corp. v. Fontenot*, 234 F.2d 898 (5th Cir. 1956) the court seemed to make a distinction between taxing the land and levying other taxes in the enclave, and upheld a severance tax on oil and gas imposed after severance from the land on a lessee of the United States, this case was overruled in *Mississippi River Fuel Corp. v. Cocreham*, 382 F.2d 929 (5th Cir. 1967) which held that the Supreme Court decision in *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 84 S.Ct. 857, 11 L.Ed.2d 782 (1964) controlled and that the state lacked authority to levy any tax in the area.

as contemplated by the Buck Act and is covered by 4 U.S.C. § 106(a), which states:

"No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area."

Income tax is defined in § 110 as "any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts." If the occupation tax is an income tax within the meaning of the Buck Act, then it "can be levied and collected within the federal area, just as if it were not a federal area." *Howard v. Commissioners of the Sinking Fund*, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953).

■ The purpose of the Buck Act was to equalize the liability for income tax between the officers and employees of the United States who reside within federal areas and those officers and employees, otherwise identically situated, who reside outside a federal area and who had become liable for state tax by the passage of the Public Salary Tax Act of 1939.[21] A further reason was to equalize the position between federal employees who were residents of federal enclaves over which the United States had been granted exclusive jurisdiction and those residing in federal areas over which the granting state had retained concurrent jurisdiction, a practice which had

been upheld by the Supreme Court in *James v. Dravo Contracting Co., supra,* in 1937.[22]

The Senate Report on the bill stresses that the definition of income tax in the Act is designed "to cover a broad field because of the great variation to be found between the different state laws" and that the intent of the committee was "to include therein any State tax (whether known as a corporate franchise tax, a business-privilege tax, or any other name) if it is levied on, with respect to, or measured by net income, gross income or gross receipts."[23]

In view of the purpose of the act and the broad definition of "income tax" found therein, many state taxes which are not denominated as income taxes and which do not conform to the federal income tax have been held to be income taxes for the purposes of the Buck Act. In *Howard v. Commissioners of the Sinking Fund, supra,* the Supreme Court held that a Kentucky business privilege tax based on the net profits of businesses, professions or occupations, which did not reach other forms of income such as capital gains and dividends, was an income tax within the meaning of the Buck Act.[24]

■ For purposes of the occupation tax at issue in this case, each individual is assessed on the basis of his occupation and a millage rate is then applied to the assessment to determine the amount owed by the individual. The assessment list for Union County was admitted as an exhibit[25] and the parties stipulated:

"17. The defendants Union County Board of Assessment (Union County Board of Commissioners) in valuing an occupation for purposes of the occupation tax used the factors or criteria used by

---

**21.** Act of April 12, 1939, ch. 59, 53 Stat. 574.

**22.** See *Kiker v. Philadelphia*, 346 Pa. 624, 637, 31 A.2d 289 (1943) quoting the Report of a subcommittee of the Committee on Finance of the United States Senate.

**23.** Report of the Senate Finance Committee of May 16, 1940 at page 5; 76th Cong. 3rd Session, Report No. 1625. Calendar No. 1692.

**24.** See also *Humble Oil and Refining Co. v. Calvert*, 478 S.W.2d 926 (S.Ct. of Texas 1972); *City of Portsmouth v. Fred C. Gardner Co. Inc.,* 215 Va. 491, 211 S.E.2d 259 (1975).

**25.** The assessments varied between $600 and zero. The warden of the penitentiary was assessed at $600, his wife as a housewife at $30. The assistant wardens were assessed at $500 and other federal employees at varying amounts according to their job classifications.

the Chester County and York County Boards of Assessment as described respectively by the Supreme Court of Pennsylvania in the case of *Crosson v. Downington Area School District*, [440 Pa. 468] 270 A.2d 377 (1970) and by the York County Court of Common Pleas in *Miller v. York Imperial School District*, 23 D&C2d (1960) and the factors and criteria set forth in the Assessors' Handbook, Chapter IX Occupation taxes, a true and correct copy of which is attached hereto and is made part of these Stipulations."

The Assessors' Handbook describes three different ways of assessing occupations: one, by a levy of a fixed amount against each occupation, with the variation in the levy on each class based on a rough calculation of the average relative income of each occupation; second, by placing a value on each occupation and levying a millage rate against that value, the values being obtained from statistical evidence of the average income earned in each occupation; a third method is to assess each taxpayer's occupation by the yield of that taxpayer from his occupation in a certain number of prior years.

Each of these methods of assessment is designed to reflect income, either the actual business income of the taxpayer, or a rough estimate of business income based on the average income of his profession. Though Union County does not appear to have used the third method, which most closely correlates the assessment to the taxpayer's actual income, it is clear from the assessment roll that care was taken so that an individual would not have to pay a tax arbitrarily unrelated to his own income if there were a wide variation in the earnings of different taxpayers with the same occupation. There are, for instance, eight different categories of clerk, four of factory worker, four of postmaster, and even two categories of nursing home owner (more than or less than 60 beds).[26] The valuations of occupations are obviously intended to reflect roughly the business income of the individu-

al assessed. The tax would seem to be with respect to income, and the rough estimate of the tax assessor would seem at least as close to income as is a levy on gross receipts.

The Pennsylvania cases referred to in the stipulation do not provide any information about the assessment of the occupation tax that would lead to a different conclusion. In *Crosson v. Downington, supra,* the Pennsylvania Supreme Court held that the occupation tax was not an income tax so as to be subject to the statutory limitation of 1% of income then fixed by Pennsylvania law. This finding is not binding on us. The Buck Act carries its own definition of income tax and whether a tax is an income tax within that definition is a matter of federal law.[27] In *Miller v. York, supra,* the occupation tax was upheld in spite of an allegation that the assessments were unreasonable when measured by the amount of income the occupation produced. The court did not examine the allegation in detail but merely speculated that historically other factors such as social status could be considered in the evaluation of an occupation. The Assessors Handbook does not mention any factor other than income, and we are not persuaded by the speculation of the York County Court.

We are, however, troubled by the $30 assessment on housewives. A housewife who is gainfully employed on either a full or part-time basis would be assessed and taxed on that occupation. The assessment list contains several valuations for part-time occupations. In *Crosson, supra,* housewives were included with retired, disabled and unemployed persons in an *unassessed* category. At oral argument counsel for the School District was unable to defend the tax on housewives as being in any way based on income. Since we cannot find that the assessment on housewives is computed with reference to income, even within the broad definition thereof in the Buck Act, we hold that the tax on housewives

26. Appendix at 18–35.

27. *Howard v. Commissioners,* 344 U.S. 624, 628–9, 73 S.Ct. 465, 97 L.Ed. 617 (1953).

cannot be levied within the federal enclave at Lewisburg.

Otherwise, we agree with the District Court's determination that the occupation tax at issue in this case is an income tax within the meaning of the Buck Act and could therefore be levied in the federal enclave.

## CONCLUSION

The order of the District Court dismissing the suit for lack of standing is reversed. Our finding that the United States had standing to bring this action to protect its own sovereignty also disposes of the School District's argument, which the District Court did not reach, that the suit is barred by the Tax Injunction Act, 28 U.S.C. § 1341. The Tax Injunction Act does not bar the United States from access to its own courts when it seeks to assert its own interest or that of its instrumentalities.[28] Nor do we find merit in the other attack by the School District on the jurisdiction of the District Court. A three-judge court is required by 28 U.S.C. § 2281 to enjoin the actions of state officers enforcing a state statute but not of local officials in raising taxes for local use. *Ex parte Public National Bank*, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928). This action does not raise the spectre of "improvident state-wide doom by a federal court of a state's legislative policy." *Phillips v. United States*, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941). The taxes at issue are authorized by state statute but nothing in that authorization is challenged by this suit, which seeks to enjoin only the action of the local taxing bodies in attempting to assess and levy the taxes in the particular geographic location of the federal enclave at Lewisburg.

The case is remanded to the District Court for entry of summary judgment and appropriate injunctive relief in favor of the United States with respect to the per capita taxes and denying such relief with respect to the occupation tax except as to the assessment on housewives. Costs shall be borne by the parties.

---

**28.** *Moe v. Confederated Salish & Kootenai Tribes*, —— U.S. ——, 96 S.Ct. 1634, 48 L.Ed.2d 96, 44 L.W. 4535 (1976); *Dept. of Employment v. United States*, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966).